[No. E005961. Fourth Dist., Div. Two. July 25, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
GLENN L. BOYD, JR., et al., Defendants and Appellants.

**COUNSEL**

Marilee Marshall and Michael Satris, under appointments by the Court of Appeal, for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, Lilia E. Garcia and David F. Taglienti, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion.

DABNEY, J.—A jury found Glenn L. Boyd, Jr., and Anthony Thomas guilty in count 1 of first degree murder (Pen. Code, § 187, subd. (a))[1] and in count 2 of second degree robbery (§ 211). The jury found not true the special circumstance allegation that Boyd committed the murder during the commission of a robbery (§§ 211/190.2, subd. (a)(17)) and the special allegations that Boyd personally used a firearm (§§ 1203.06, subd. (a)(1)/12022.5) and that Thomas was a principal in the commission of the crimes in which his coparticipant was armed with a firearm (§ 12022, subd. (a)). The trial court sentenced Boyd to state prison for a term of 25 years to life on count 1 and a concurrent 5-year term on count 2. The court sentenced Thomas to a term of 25 years to life on count 1, a consecutive 1-year term on count 2, and a consecutive 5-year term for a separate conviction for sale of a narcotic substance.

On appeal, both defendants contend that (1) the trial court failed to instruct the jury on the elements of aiding and abetting a crime; (2) an *Aranda*[2] violation and the breach of an agreement by the prosecutor occurred when defendants' statements which implicated each other were admitted in their joint trial; (3) the trial court failed to instruct the jury sua sponte on the lesser included offense of second degree murder; (4) the trial court erred in several evidentiary rulings; (5) the prosecutor committed prejudicial misconduct in closing argument; and (6) the prosecutor failed to disclose evidence favorable to the defense until after the trial was over.

Boyd contends that the prosecutor acted in bad faith by questioning defendants without a reasonable basis for believing the underlying facts to be true. Thomas contends that (1) the trial court improperly admitted an identification of Thomas which was the product of an unduly suggestive lineup; (2) the court failed to instruct the jury that the flight instruction applied only to Boyd; (3) the consecutive sentences for robbery and felony murder violate section 654; and (4) the trial court failed to state proper reasons for imposing consecutive sentences.

### Facts

On September 9, 1987, at about 12:50 a.m., Kenneth Burley, a driver for Domino's Pizza in San Bernardino, left to deliver a pizza to an apartment at 2004 McKinley Street in San Bernardino. Kurtis Hobel was sitting on the lawn on front of his family's apartment at the corner of 20th Street and

---

[1] All statutory references are to the Penal Code unless otherwise indicated.
[2] From *People* v. *Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265].

McKinley talking to Lisa Lopez. Kurtis Hobel's sister, Hope Hobel, was also there with a friend, Kelly Evans. The moon was almost full, the sky was clear, and street lights were on. Kurtis Hobel saw a blue pickup truck park at an angle on the left side of McKinley.[3] Burley, wearing a Domino's Pizza shirt and matching baseball cap, got out of the truck. Burley left the truck's headlights on and walked toward an apartment complex. Two men, whom Kurtis Hobel later identified as Boyd and Thomas, approached Burley, who stood with his back to Kurtis Hobel. Boyd stood on Burley's left and Thomas on Burley's right, facing Burley. Boyd held a clear bottle and took a drink from it.

Kurtis Hobel heard the words, "Give me," and "Money." He then heard, "I don't have any." Burley put his hands in his front pants' pockets, pulled them out and raised them palms up. Kurtis Hobel did not see Burley give Boyd and Thomas anything, but he heard something like, "Is that all." Burley simultaneously tapped his rear pants' pockets with his hands. Boyd then struck Burley in the face with his right hand and Thomas kicked Burley between the legs. When Burley bent forward and grabbed his groin, Boyd raised his right hand. Kurtis Hobel saw a flash on Burley's left and heard a gunshot, but did not see a gun. Burley fell to the ground. Boyd and Thomas went north on McKinley. Kurtis Hobel heard a car door shut and saw a white Chevrolet Blazer which had been parked on McKinley drive away. He did not see anyone in the Blazer, but told the police that Boyd and Thomas could have been inside.

Burley died almost instantly from a gunshot wound to the heart. The wound was caused by a bullet which could have been anything from .30- to .44-caliber.

When the shooting occurred, Hope Hobel and Evans jumped up because the bullet appeared to ricochet on the curb close to them. A .44-caliber bullet was later found in the gutter near where they had been sitting. The bullet matched bullets found in the trunk of a car which belonged to a friend of Boyd. However, the murder weapon was never found.

Detective Craig Keith of the San Bernardino Police Department investigated the crime scene. He discovered a clear glass bottle partly full of beer lying a few feet from Burley's body. The label had been torn off the bottle. A latent fingerprint lifted from the bottle was identical to that of Boyd's right middle finger. Keith found an Old English 800 beer bottle at the base of an apartment building nearby. Investigators also found torn pieces of a

---

[3] Undisputed evidence established that Kurtis Hobel was about 170 feet away from the events he witnessed.

beer bottle label and several coins scattered on the ground near Burley's body. A latent fingerprint lifted from one of the pieces of label matched that of Mark Miles's right thumb. Burley's pants' pockets were turned inside out.

Kurtis Hobel told a police officer that night that he would be unable to identify the assailants because he did not see their faces. He also stated that all Blacks look alike in the dark. At trial, he explained that he told the officer he would be unable to identify anyone because he was ambivalent about becoming involved, and he was concerned for his family's safety. He stated that the second remark was a joke.

At trial, Kurtis Hobel testified that the man who shot Burley was five feet nine inches to five feet ten inches tall and weighed one hundred sixty-five to one hundred seventy pounds, wore light colored clothing and had curly, wet-looking hair. The man who stood on Burley's right was an inch or two taller and lighter complexioned than the shooter, but weighed about the same, and wore dark jeans, a light shirt, and a visor. Right after the shooting, Kurtis Hobel had described the second man as four to five inches taller than the shooter.[4] Kurtis Hobel also testified that both of the assailants had worn their hair in a "Jheri-curl" style.

In late November 1987, Kurtis Hobel viewed photographic lineups which included Thomas's and Boyd's photographs. He did not identify anyone. On December 2, 1987, Kurtis Hobel, Lopez, and Evans viewed a six-person live lineup. Kurtis Hobel identified number 5, Thomas, as the man who had stood on Burley's right during the shooting. Neither Lopez nor Evans could identify anyone. Two days later, Kurtis Hobel viewed a second live lineup. He identified number 3 as the second assailant. Boyd was in number 4 position. At trial, Kurtis Hobel testified that he thought number 4 also resembled the assailant. Evans also attended that lineup but failed to identify anyone.

Thomas was arrested on September 10, 1987, during a routine traffic stop. En route to the medical center for a prejail checkup, Thomas volunteered that he did not shoot the delivery man, but that "G-Bo" had. Mark Miles was also arrested in connection with the shooting.[5]

On September 13, 1987, Keith interviewed Paris Reeves, who knew of Thomas's and Miles's arrests. Reeves volunteered that the third person involved was Boyd, also known as G-Bo. Reeves said he had seen G-Bo,

---

[4] Boyd and Thomas are both about five feet nine inches tall; Burley was six feet tall.
[5] The record does not reflect that Miles was prosecuted for the killing.

Thomas and another person in the alley west of McKinley about an hour before the shooting, and that Boyd had a "Dirty Harry" style handgun. At trial, Reeves denied that he told Keith he had seen defendants near the crime scene, that Boyd had had a gun, or that either Thomas or Boyd had shot the victim.

Burley's supervisor testified that when Burley started his shift in the evening of September 9, he received a $20 "bank" to use to give change to customers. When he left to make the delivery, he was wearing a watch and a gold chain. No watch, chain or money was found on Burley's body. The pizza and carrier bag were never found.

Angelina Garcia testified that she lived with her three sons at 2178 East 19th Street. Shortly before Burley was killed, Thomas, known to her as "Commando," knocked at her door. Boyd waited in a green car with a woman. Thomas asked for Angelina Garcia's son, Johnny Demison, who was not there. Thomas kept insisting that Johnny was there and opened his jacket to display a gun. Angelina Garcia and her relatives told Thomas to go away. Thomas ran down the street away from the car. Angelina Garcia reported the incident to the police. Angelina Garcia testified that she later received a telephone call from her son, Johnny Demison, telling her not to testify. He told her that the guys involved had money, and someone would get hurt. He mentioned Commando and G-Bo.

An officer testified that at about 12:25 a.m., he contacted Angelina Garcia in response to a report of a disturbance. The officer asked her if any weapons were involved, and she told him she had not seen any. He did not interview anyone else.

Hayward Demison, Angelina Garcia's brother, corroborated her testimony, except that he stated Thomas came to her door between 8 and 9 p.m., and that Boyd was not there. Hayward Demison denied seeing Thomas with a gun. Angelina Garcia's son, Alexander Garcia, testified that the incident occurred between 7 and 8 p.m. He saw a gun in Thomas's hand.

Hayward Demison further testified that he was making a telephone call that night at a phone booth at Highland and Sterling when he heard a gunshot. He walked to the front of a store, looked across the parking lot and saw three men, one of whom was Thomas, running from the direction of Guthrie. He heard someone shout, "G-Bo." Thomas did not react. One of the men, not Thomas, had a shiny handgun. The men split up and Hayward Demison lost sight of them as they ran between buildings. While driving near Guthrie and 20th, he saw a man lying in the road and a truck

which said "Domino's Pizza" on the side.[6] Hayward Demison testified that Johnny Demison asked him not to testify because the defendants were his friends.[7]

Johnny Demison testified that he was in state prison in September 1987. He claimed he did not know either Boyd or Thomas, had never spoken to either of them, and was not afraid of them. He denied telling his relatives not to testify. According to sheriff's department records, Johnny Demison was not in custody on September 9 and September 10.

Fred Fuchs, a high school student who knew Thomas, testified that he saw Thomas the afternoon before the shooting outside an apartment complex at 20th and McKinley. Thomas had a large silver "Dirty Harry" type gun.

Tracy Parker, Mark Miles's sister, who lived at 20th and McKinley, testified that she had often seen Boyd in her neighborhood before the shooting. She testified that he wore his hair in a Jheri-curl. Parker also knew Thomas and had seen him in her neighborhood. She had seen him drinking Old English 800 beer, a popular beverage in the neighborhood. He used to peel the label off his bottle.

Louisette Ridley, Thomas's fiancée, testified that Thomas returned to her apartment about an hour after the shooting. He told her that he, Boyd, Miles and others had been shooting dice outside before the shooting.

*Defense Evidence.* Louisette Hamlin, the daughter of Thomas's fiancée, testified that she went outside about 20 minutes after she heard a shot and saw the white Blazer drive off. The driver was not Miles. After the shooting, Thomas came back into Ridley's house carrying a bottle. The police were there.

Lopez testified that she was talking to Kurtis Hobel when the delivery truck drove up. Burley walked through the area and then returned, still carrying the pizza. Two Black men approached him. One man, two inches taller than Burley, was lighter skinned than the other. A tree near where the men were standing made it difficult to see, and Lopez was not wearing her glasses. Lopez saw Burley turn his pockets inside out. The taller man hit

---

[6] In fact, Burley's supervisor and other witnesses testified that Burley used his own truck which did not have any identifying signs.

[7] Hans VanderVeen, an investigator for the district attorney, testified that Hayward Demison had given him a different version of his observations. Hayward Demison told Vander-Veen that Thomas had had a gun, and that Thomas had turned when someone shouted, "G-Bo."

him in the face and kicked him between the legs, yelling that he wanted Burley's money. Burley bent down and grabbed himself and then was shot; Lopez did not see who shot him. The men ran away. Lopez saw a white Blazer coming up the street, but she did not see it turn the corner. Kurtis Hobel told her he saw the two men get into the Blazer.

Lopez was unable to identify anyone in two sets of photographs. Lopez did not identify Thomas in the live lineup she attended, and she did not identify Thomas or Boyd in court. She stated that the taller of the two assailants was taller than Thomas and darker skinned.

Dr. Robert Shomer, a psychologist and expert in eyewitness identification, testified as to the factors which affect the accuracy of identifications. Defense counsel posed a hypothetical question based on the evidence in this case, and in response, Shomer stated his opinion that any identification would have been tainted.

Dennis Nodine, a newspaper delivery man, drove by 20th and McKinley around the time of the shooting. He saw a blue pickup truck with its headlights on. A man wearing a Domino's Pizza shirt and holding a pizza box was standing with two Black men south of the truck. One of the men was tall and skinny and was wearing a jacket and baseball cap. The other man was about the same height as the pizza delivery man. Nodine saw a third person behind the two Black men, but Nodine could not describe him. Nodine could not identify any of the men he saw.

A police officer testified that Kurtis Hobel said he had seen the taller man get into the driver's seat of the Blazer, and that the Blazer then took off. The Blazer belonged to the wife of George Mackey. Other witnesses testified that Mackey had been present at a dice game in the area earlier that night. In a parole search of Mackey's apartment after the killing, officers seized a jacket which had possible gunshot residue on the sleeve and possible human bloodstains inside.

Detective Keith testified that Miles told him he had been at his mother's house when the shooting occurred and did not know what had happened. Miles later said he had been at the scene. He had asked his sister to order a pizza for him. While he waited for the pizza to arrive, an acquaintance drove by looking for Miles's cousin. Miles left with the man for about 20 minutes to find the cousin. As they were returning, Miles heard gunfire. He jumped out of the car and saw a truck with a pizza company sign on it. A man was lying on the grass on his back with blood spurting from his chest.

Miles later told Keith he had seen the men wrestling when the gun went off. Miles also told Keith that he had seen the pizza man lying face up with

blood pumping out of his chest area. He went to a convenience store and called a cab and was taken to his mother's house. The ride cost $15. Miles also told Keith he had gone to his sister's house right after the incident and had spoken to his mother, who was staying there.[8]

At trial, Miles testified that he had been driving on 20th approaching McKinley when he saw three people. One of them struck another, there was a gunshot, and one of them fell. One of the men ran into an apartment complex across McKinley; the other went into a different apartment complex.

Cody Klemp, an acquaintance of Boyd and Thomas, testified he had been helping Boyd fix his car on September 9. Boyd had been having problems with his front brakes and bearings, but the car could be driven a few blocks. At about 10 or 11 p.m. that evening, Klemp gave Boyd and a woman a ride to Del Rosa and Ironwood.[9] Klemp did not see Thomas the day or night of the crime. Klemp was impeached with two prior felony convictions. Klemp and several other witnesses testified that Boyd wore a cast on his right hand and a splint and an ace bandage on his left hand around the time of the killing.

Thomas testified in his own behalf. In September 1987, Thomas had been staying with his fiancée, Louisette Ridley. At about 8:30, he went to visit Constantino Hall, who lived with his mother, Angelina Garcia. Hayward Demison told Thomas that Hall was not home and pulled out a gun. Thomas ran back to McKinley and stayed at Ridley's apartment for awhile. He went out again at about 10 p.m. and joined a dice game. Miles, Boyd and other men were there. Boyd and another man went out to get beer which they brought back in a paper bag. Boyd wore a cast on his right hand. Boyd handed a beer to Thomas and one to Miles. Thomas drank a 40-ounce bottle of Old English beer and peeled the label off the bottle. Boyd was not drinking. Boyd left with a woman at about 10:30 p.m.; Thomas did not see him again.

Thomas also left about 10:30 p.m. with a woman named Sharon. He stayed at Sharon's house until about midnight and went to the convenience store. When he returned to Ridley's apartment, there were police and yellow tape in the area. There were police in Ridley's apartment, but they did not talk to him, and he fell asleep.

---

[8] In rebuttal, a dispatcher for the Yellow Cab company testified that the company had no record of any cab being dispatched to a convenience store in the area that evening.

[9] In rebuttal, Officer Keith testified that in an interview, Klemp said he had last seen Boyd at 4 p.m. on September 9.

Thomas testified that he gave a false name when he was arrested the next day because he had a warrant outstanding. He denied that he ever owned or used a gun. He denied that he shot Burley or even saw him that night. He denied making the following statements to the police: that he did not know Miles, that Boyd told him Boyd shot Burley while they struggled over a gun, and that he did not know Johnny Demison or Denise Nickleberry other than by sight. He testified that he and Boyd were "associates," but were not friends.

Boyd also testified in his own behalf. He had lived in Los Angeles after July 1987, and only visited San Bernardino occasionally. During his visits, he stayed with Dennis Muse on Golden Avenue. He once turned in Muse's rent payment.[10] Muse had rented the apartment using a false name. Boyd knew Thomas, but they were not friends.

On September 9, Boyd went to 20th and McKinley where a friend worked on his car for him. A dice game started around 9:30 or 10 p.m. Thomas and Miles were there. Boyd did not join the game; he and another man went out to buy beer. When they returned, Thomas took a bottle of Old English beer out of the bag. Boyd passed out the rest, touching several of the bottles in doing so.

Boyd left the area about 15 minutes after he had returned with the beer. He and a young woman went to a 7-Eleven store and played video games. When they returned, the dice game had broken up. Boyd went to Klemp's house to telephone his cousin in Los Angeles to ask for a ride, but there was no answer. Just before midnight, Klemp gave Boyd a ride back to Muse's apartment, where Boyd spent the night alone. The next day, Boyd's cousin, Jeffery Traylor, picked him up and took him back to Los Angeles. Boyd learned a few days later that he was a suspect. He surrendered to the police on October 22.

Boyd testified that both his hands were injured in September 1987. One had all the knuckles broken and had pins in it. He had a cast on his right hand and a splint on the left hand. Even at time of trial, he could not make a fist. He had his hand treated at San Bernardino County Hospital, using the name Glen Miles, to avoid paying for the treatment. The incident happened in June 1987, and he was in the hospital for 10 days. The cast was not removed until September 30, 1987.[11]

---

[10] In rebuttal, the manager of Muse's apartment testified that she had rented the apartment to Boyd in May 1987, under the name of William Higgs. Boyd paid the July rent. The manager was shown a picture of Muse and testified that she did not recognize him.

[11] In rebuttal, an orthopedic surgeon who had treated Boyd under the name Glen Miles testified that on June 22, 1987, he had operated on Boyd's hand to repair injuries to the tendons

Boyd denied telling Traylor he had seen the pizza man killed, that he had come around the corner and seen Miles and Thomas struggling with the pizza man and heard a gun go off, that he had been scared and had dropped a bottle of beer he was holding, that he had seen a big chrome gun hidden in the bushes in the area, or that he had sent someone to move his car. Boyd denied that he killed Burley or robbed him. When the killing occurred, he was asleep at Muse's apartment.

*Rebuttal.* The officer who arrested Thomas testified that on the way to the medical center for a prejail checkup, Thomas spontaneously stated that he had not shot the pizza man, but that G-Bo had. An officer who interviewed Thomas after his arrest testified that Thomas had denied that he was known as Commando, that he knew Miles, that he had participated in a dice game the night of the shooting, that he was drinking beer that night, that he knew anyone who drove a white Blazer, and that he knew anyone named G-Bo. Thomas later stated that he had heard of G-Bo, but did not know him. The officer showed Thomas a photographic lineup which contained Boyd's photograph, and Thomas said he did not recognize anyone.

Traylor testified that Boyd never told him Boyd had witnessed the shooting. Boyd said he had been some distance away when he heard a shot and walked away. Boyd said he was too far away to see anything. When Traylor spoke to VanderVeen, he reported a combination of what he had heard from Boyd, Boyd's sister and others. Thomas had visited Traylor's house in Los Angeles.

Other pertinent facts are set forth in the discussion of the issues.

## DISCUSSION

### DEFENDANTS' JOINT CONTENTIONS

*1. Adequacy of Aiding and Abetting Instruction.* Defendants claim the trial court erred in failing to instruct the jury that mere presence at the scene of a crime and mere knowledge of the crime do not constitute aiding and abetting. ■ To be liable for a crime as an abettor, the accused must have instigated or advised the commission of the crime or have been present for the purpose of assisting the crime. He must share the criminal intent with which the crime was committed. Neither his mere presence at the scene of the crime nor his failure, through fear, to prevent a crime

---

caused by a human bite wound. No pins were inserted. The surgeon testified that the usual treatment for such an injury is to splint the arm for up to six weeks. The patient should have no difficulty grasping objects. Boyd did not have a cast, but wore two plaster splints held together by an Ace bandage.

establishes, without more, that an accused was an abettor. (*People* v. *Durham* (1969) 70 Cal.2d 171, 181 [74 Cal.Rptr. 262, 449 P.2d 198].)

■ The court instructed the jury under CALJIC No. 3.00 that persons who actively commit crimes and those who aid and abet in the commission of crimes are both regarded as principals. The court also instructed the jury under CALJIC No. 8.27.[12] However, the court failed to instruct the jury under CALJIC No. 3.01.[13] Because CALJIC No. 8.27 duplicates all but the last two paragraphs of CALJIC No. 3.01, it is only the omission of those paragraphs which defendants claim as error.

■ The trial court must instruct the jury on general principles of law relevant to the issues raised by the evidence, even absent a request. (*People* v. *Wilson* (1967) 66 Cal.2d 749, 759 [59 Cal.Rptr. 156, 427 P.2d 820].) The use note to CALJIC No. 3.01 (5th ed. 1988 bound vol.) states that the instruction "should be given sua sponte in every case in which any defendant is prosecuted as an aider and abettor." A court must give the last two paragraphs of CALJIC No. 3.01 sua sponte when the evidence warrants it. (*People* v. *Perry* (1979) 100 Cal.App.3d 251, 260 [161 Cal.Rptr. 108].) However, "[i]t is not error to omit an instruction which is not based upon substantial evidence. [Citation.]" (*People* v. *Northrop* (1982) 132 Cal.App.3d 1027, 1040 [182 Cal.Rptr. 197], disapproved on another ground in *People* v. *Smith* (1984) 35 Cal.3d 798, 808 [201 Cal.Rptr. 311, 678 P.2d 886].)[14]

---

[12] The instruction, as read to the jury, stated: "If a human being is killed by any one of several persons engaged in the perpetration of, or attempt to perpetrate, the crime of robbery, all persons who either directly and actively commit the act constituting such crime or who with knowledge of the unlawful purpose of the perpetrator of the crime and with the intent or purpose of committing, encouraging, or facilitating the commission of the offense aid, promote, encourage, or instigate by act or advice its commission, are guilty of murder of the first degree, whether the killing is intentional, unintentional, or accidental."

[13] CALJIC No. 3.01 (5th ed. 1988 bound vol.) states: "A person aids and abets the [commission] . . . of a crime when he or she, [¶] (1) with knowledge of the unlawful purpose of the perpetrator and [¶] (2) with the intent or purpose of committing, encouraging, or facilitating the commission of the crime, by act or advice aids, promotes, encourages or instigates the commission of the crime.

". . . . . . . . . . . . . . . . .

"[Mere presence at the scene of a crime which does not itself assist the commission of the crime does not amount to aiding and abetting.]

"[Mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting.]"

[14] Boyd contends that *Perry* stands for the rule that a court must sua sponte give the "mere presence" instruction "whenever there is evidence believable or not that warrants it." This language in *Perry* was based on dicta in *People* v. *Carmen* (1951) 36 Cal.2d 768, 773 [228 P.2d 281] that jury instructions must be given whenever any evidence is presented, no matter how weak. In *People* v. *Flannel* (1979) 25 Cal.3d 668, 684, footnote 12 [160 Cal.Rptr. 84, 603 P.2d 1], the court repudiated this interpretation of *Carmen*. *Flannel* established the current

■ We thus examine the record to determine whether it contains substantial evidence to support instructions on mere presence and mere knowledge. Lopez testified that the same person both hit and kicked the victim. Kurtis Hobel testified that the man who had hit Burley was the shooter, and that man was Boyd, not Thomas. The jury found not true the special allegation that Boyd had personally used a firearm, rejecting the prosecutor's theory that Boyd was the triggerman. Boyd argues that his extrajudicial statements suggested that he had been present but had not participated in the crime. As noted above, the statements indicated that Boyd had heard the gunshot and walked away.

We conclude that the evidence on which defendants rely would not require the trial court to give the mere presence or mere knowledge instructions sua sponte. The instructions would have been inconsistent with defendants' theories of defense. (*Northrop, supra,* 132 Cal.App.3d at p. 1041; cf. *People* v. *Geiger* (1984) 35 Cal.3d 510, 531-532 [199 Cal.Rptr. 45, 674 P.2d 1303, 50 A.L.R.4th 1055].) Both defendants relied on the defenses of alibi and mistaken identity. They attempted to show that Mark Miles, Johnny Demison, George Mackey, or others were the killers. Moreover, defendants never argued that the evidence at most showed that one or more of the persons at the killing was merely present without otherwise participating or merely knew the crimes were occurring, but did nothing to prevent the crimes. The trial court had no sua sponte duty to instruct on mere presence or mere knowledge.

*2. Aranda Error and Breach of Agreement by Prosecutor.* ■ Defendants contend that the trial court committed *Aranda* error in permitting the prosecutor to introduce into evidence the extrajudicial statement of each defendant in which he inculpated his codefendant.[15] Boyd objects to the following statements:

A. During cross-examination of Thomas, the prosecutor asked, "On the way to the County Jail, didn't you tell the officers that you were with that it was G-Bo [Boyd] who shot the guy?" Thomas denied making the statement. In rebuttal, Officer Armstrong testified that during transport Thomas had volunteered that he did not shoot the delivery man, but that G-Bo did;

B. During cross-examination of Thomas, the prosecutor asked, "Didn't [Boyd] tell you that he and the pizza man were wrestling for the gun and the pizza man was beating him and that's why he shot him." Thomas

---

rule that to warrant a sua sponte jury instruction, evidence must be presented that is substantial enough to merit consideration. (*Id.*, at pp. 684-685.)

[15] Defendants do not contend that the error was federal constitutional error under *Bruton* v. *United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620].

denied that Boyd had told him that or that he had told anyone Boyd had done so;

C. Louisette Ridley testified that Thomas had told her he had been outside shooting dice with G-Bo and Miles before the shooting occurred; and

D. After Thomas's arrest, police officers taped a conversation he had with Miles in which Thomas mentioned the name G-Bo.

Thomas complains that the prosecutor asked Boyd during cross-examination whether Boyd had told his cousin, Jeffery Traylor, that Boyd "came around the corner and saw Commando [Thomas] and another person, perhaps Mark [Miles], struggling with the pizza man and then hearing the gun go off." Boyd denied making the statement. Traylor also denied that Boyd had told him he had seen the shooting; rather, Boyd had said he heard a gunshot and walked away; it had been too dark to see anything. Investigator VanderVeen then testified that Traylor had told him that Boyd had told Traylor that when Boyd was walking in the area of the shooting at about 1 a.m., ". . . he saw a truck parked in the middle of the street and his friends in some kind of commotion with a pizza man." VanderVeen continued, "[Boyd] told Mr. Traylor that Commando was there . . ."

*a. Abrogation of Aranda.* Respondent asserts, "Since *Aranda* is a judicially declared rule of criminal procedure, . . . we submit it has been abrogated by Proposition 8, to the extent it requires the exclusion of evidence whose exclusion is not compelled by the federal Constitution. (See, *People* v. *May* (1988) 44 Cal.3d 309, 319-320 [243 Cal.Rptr. 369, 748 P.2d 307].)"[16] In 1982, California voters enacted Proposition 8 which added article I, section 28, subdivision (d) to the California Constitution. Section 28, subdivision (d) states, "Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding, . . . Nothing in this section shall affect any existing statutory rule of evidence relating to privilege or hearsay, or Evidence Code, Sections 352, 782 or 1103. . . ." Our determination of whether the *Aranda* rule was abrogated by Proposition 8 involves an examination of (1) the historical background of the *Aranda* rule, and (2) the scope of the federal constitutional basis for the rule.

*b. Historical Background of Aranda Rule.* An extrajudicial confession or admission of one defendant which implicates another defendant is hearsay

---

[16] The prosecutor did not argue at trial that the *Aranda* rule was abrogated by Proposition 8.

as to the latter. (Evid. Code, § 1200.)[17] As to the declarant himself, however, the confession or admission may be introduced as the admission of a party. (Evid. Code, § 1220.)[18] In a joint trial the problem arises of how to limit the jury's consideration of such evidence only to the declarant, without prejudice to codefendants against whom the evidence is inadmissible. As the *Aranda* court noted, "At best, the rule permitting joint trials in such cases is a compromise between the policies in favor of joint trials and the policies underlying the exclusion of hearsay declarations against one who did not make them." (*Aranda, supra,* 63 Cal.2d at p. 526, fn. omitted.)

Prior to *Aranda,* the rule in California courts was that ". . . a joint trial [was] permissible . . . even though the prosecution ha[d] obtained a confession from one defendant inculpating both defendants and intend[ed] to introduce that confession into evidence [citations]. The rationale . . . [was] that a jury will comprehend and apply instructions to limit the effect of a confession to the particular declarant. [Citations.]" (*Aranda, supra,* 63 Cal.2d at p. 524.) That rule was subject to serious criticism: "It 'results in serious impairment of the rights of the accused to a fair consideration by an impartial jury of the competent evidence produced against him.' [Citations.] It is a 'fiction' and a 'naive assumption' about the way juries can function. [Citations.] [It] calls upon the jury to perform 'a mental gymnastic which is beyond, not only their powers, but anybody's else.' [Citations.]" (*Id.,* at p. 525.)

Responding to this criticism, the California Supreme Court held, "When the prosecution proposes to introduce into evidence an extrajudicial statement of one defendant that implicates a codefendant, the trial court must adopt one of the following procedures: (1) It can permit a joint trial if all parts of the extrajudicial statements implicating any codefendants can be and are effectively deleted without prejudice to the declarant. . . . (2) It can grant a severance of trials if the prosecution insists that it must use the extrajudicial statements and it appears that effective deletions cannot be made. (3) If the prosecution has successfully resisted a motion for severance and thereafter offers an extrajudicial statement implicating a codefendant, the trial court must exclude it if effective deletions are not possible." (*Aranda, supra,* 63 Cal.2d at pp. 530-531, fn. omitted.)

*c. Federal Constitutional Basis for Aranda Rule.* When the *Aranda* court announced its decision, the United States Supreme Court had approved the

---

[17] Evidence Code section 1200 provides: "(a) 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated. [¶] (b) Except as provided by law, hearsay evidence is inadmissible."

[18] "Evidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party . . . ." (Evid. Code, § 1220.)

rule in federal courts that a joint trial was permissible even though one defendant's extrajudicial confession implicating another defendant would be introduced into evidence. (*Delli Paoli* v. *United States* (1957) 352 U.S. 232 [1 L.Ed.2d 278, 77 S.Ct. 294], overruled in *Bruton* v. *United States, supra,* 391 U.S. at p. 126 [20 L.Ed.2d at pp. 479-480].) In light of this decision, the *Aranda* court could not base its holding on federal constitutional principles. The court explained, "In the absence . . . of a holding by the United States Supreme Court that the due process clause requires such change, the rules we now adopt are to be regarded, not as constitutionally compelled, but as judicially declared rules of practice . . . ." (*Aranda, supra,* 63 Cal.2d at p. 530, fn. omitted.)

After the *Aranda* decision, the United States Supreme Court overruled *Delli Paoli,* and announced a new federal constitutional rule: at a joint trial, the admission into evidence of a *nontestifying* codefendant's confession which implicates the other defendant violates the other defendant's right under the Sixth Amendment to confront witnesses, and that the violation cannot be cured by having the trial court instruct the jury to disregard the statement in determining the innocence or guilt of every defendant except the one who made the statement. (*Bruton* v. *United States, supra,* 391 U.S. at pp. 123-126 [20 L.Ed.2d at pp. 478-480].)

After the *Bruton* decision, the California Supreme Court could then acknowledge the constitutional foundation for its *Aranda* rule. In *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1121 [240 Cal.Rptr. 585, 742 P.2d 1306], the court explained, "In *People* v. *Aranda, supra,* 63 Cal.2d 518, 528-530, we anticipated the effect of *Bruton* by holding that even if a limiting instruction is given it is error to admit at a joint trial a codefendant's extrajudicial self-incriminating statement when such statement inculpates another defendant. In coming to this conclusion we declined to rest on constitutional grounds, but acknowledged that the defendant's right of confrontation and cross-examination was implicated. (*Id.* at pp. 529-530.) Subsequently, however, we recognized that the *Aranda* rule is based at least in part on constitutional considerations. (See *People* v. *Floyd* (1970) 1 Cal.3d 694, 719 [. . .].) The premise of *Aranda* is essentially the same as that of *Bruton:* jurors should not be permitted to be influenced by evidence that as a matter of law they cannot consider but as a matter of fact they cannot ignore. (*Aranda, supra,* 63 Cal.2d at pp. 528-530.)"

California courts have consistently ruled that *Aranda* is violated whether or not the declarant testifies at trial. (*People* v. *Brown* (1978) 79 Cal.App.3d 649, 657 [145 Cal.Rptr. 130]; *People* v. *Atkins* (1975) 53 Cal.App.3d 348, 356-357 [125 Cal.Rptr. 855]; *People* v. *Matola* (1968) 259 Cal.App.2d 686, 692-693.) In contrast, in *Nelson* v. *O'Neil* (1971) 402 U.S. 622 [29 L.Ed.2d 222, 91 S.Ct. 1723], the United States Supreme Court held that when "a

codefendant takes the stand in his own defense, denies making an alleged out-of-court statement implicating the defendant, and proceeds to testify favorably to the defendant concerning the underlying facts, the defendant has been denied no rights protected by the Sixth and Fourteenth Amendments." (*Id.*, at pp. 629-630 [29 L.Ed.2d at p. 228].) *Bruton,* by its own terms and as refined by *O'Neil,* requires exclusion of evidence only when the defendant who makes the inculpatory extrajudicial statement does not testify. (*Bruton* v. *United States, supra,* 391 U.S. at pp. 127-128 [20 L.Ed.2d at pp. 480-481]; *Nelson* v. *O'Neil, supra,* 402 U.S. at p. 629 [29 L.Ed.2d at p. 228].) The present case does not involve *Bruton* error, because both defendants testified at trial and were cross-examined.

We now consider whether the *Aranda* rule was abrogated by Proposition 8. In *People* v. *Jacobs* (1987) 195 Cal.App.3d 1636, 1650 [241 Cal.Rptr. 550] the court held that the *Aranda* rule had survived the passage of Proposition 8. The *Jacobs* court noted that even though the *Aranda* court did not originally rest its rule on constitutional grounds, the California Supreme Court had later recognized the constitutional foundation of its rule. (See *Anderson, supra,* 43 Cal.3d at p. 1121; *People* v. *Floyd,* (1970) 1 Cal.3d 694, 719 [83 Cal.Rptr. 608, 464 P.2d 64].) However, the factual situation presented in *Jacobs* was classic *Bruton* error: a codefendant's extrajudicial statements were introduced through the testimony of his cellmates; the codefendant himself did not testify and was thus not available for cross-examination. (*Jacobs, supra,* 195 Cal.App.3d at pp. 1646-1647.) We agree with the conclusion of the *Jacobs* court that the *Bruton* rule binds California courts; Proposition 8 was powerless to affect a federal constitutional rule.

The issue we must decide, not presented to the *Jacobs* court, is whether there is any federal constitutional foundation for *Aranda*'s exclusion of the statements of a codefendant who testifies and is cross-examined. In *People* v. *May* (1988) 44 Cal.3d 309 [243 Cal.Rptr. 369, 748 P.2d 307], the California Supreme Court stated, "[S]ection 28(d) was intended to preclude . . . reliance on the state Constitution to create new exclusionary rules rejected by applicable decisions of the United States Supreme Court." (*Id.,* at p. 319.) The court explained, "[I]t seems very likely that Proposition 8 was crafted for the very purpose, among others, of abrogating cases . . . which had elevated the procedural rights of the criminal defendant above the level required by the federal Constitution, as interpreted by the United States Supreme Court. [Citation.]" (*Id.,* at p. 318.) Thus, to the extent *Aranda* required exclusion of inculpatory extrajudicial statements of codefendants, even when the codefendant testified and was available for cross-examination at trial, *Aranda* was abrogated by Proposition 8. There is no federal constitutional basis for requiring exclusion of a codefendant's statements when the codefendant testifies at trial and is subject to cross-examination. (*Nelson*

v. *O'Neil, supra,* 402 U.S. at p. 629 [29 L.Ed.2d at p. 228]; see also *Atkins, supra,* 53 Cal.App.3d at p. 357 [suggesting that when the right of confrontation is not violated, the *Aranda* rule involves "an evidentiary rule excluding hearsay evidence, and not of constitutional dimension . . ."].) However, to the extent *Aranda* duplicates the protections available under the federal Constitution, as defined in *Bruton* and *O'Neil,* the *Aranda* rule survives the passage of Proposition 8. The California rule is now coextensive with the federal rule.

*d. Evidence Code section 352.* Thomas notes that article I, section 28, subdivision (d) of the California Constitution contains an express exception for evidence found to be unduly prejudicial under Evidence Code section 352. Thomas argues that *Aranda* established as a matter of law that the relevance of codefendants' extrajudicial statements is always outweighed by their prejudice. Thus, he contends, even after the passage of Proposition 8, trial courts remain not only empowered, but also duty bound, to exclude statements within *Aranda.*

In another context, the California Supreme Court has ruled that similar judicially created rules of prejudice were abrogated by Proposition 8. In a series of cases discussed in *People* v. *Castro* (1985) 38 Cal.3d 301, 307-308 [211 Cal.Rptr. 719, 696 P.2d 111], California courts had created "rigid, black letter rules of exclusion," (*id.,* at p. 312) virtually forbidding impeachment of a criminal defendant by prior convictions that were remote in time or too similar to the current prosecution. The *Castro* court held that although courts must still determine prejudice under Evidence Code section 352 in individual cases, automatic exclusion for remoteness or similarity was no longer required. (*Id.,* at pp. 309-313.) We reach the same conclusion in this case. Section 352 governs the trial court's discretion; however, any "rigid, black letter rule of exclusion" has been abrogated in the circumstances presented in this case.

The issue of error under section 352 was not preserved for appeal. Defendants did not make either an express or implied objection on this basis. (*Anderson, supra,* 43 Cal.3d at p. 1129, fn. 3.)[19]

*e. Violation of Agreement by Prosecutor.* ■ Defendants next contend that even if there was not *Aranda* error, the prosecutor violated a pretrial agreement to not introduce the inculpatory statements unless references to the codefendants were deleted. The record reflects that during the motions

---

[19] Boyd's attorney objected that questions which were based on Nickleberry's statements to the investigator were prejudicial "unless those questions are posed in good faith." Based on our review of the record, we construe this a challenge to the prosecutor's good faith belief in the facts underlying the questions rather than an objection under section 352.

*in limine* before trial, during a discussion of potential *Aranda* problems the prosecutor stated, "What I think I indicated is there may be one or two statements, but to the extent that there are the codefendant will not be mentioned."

Nonetheless, the prosecutor failed to delete references to the codefendants in such statements when cross-examining defendants. This was improper; the prosecutor represented on the record that the statements would be edited to exclude such references. Even though the statements came in through the prosecutor's questions rather than through defendants' responses, courts have long condemned similar attempts, "under the guise of cross-examination, [to] get before the jury what is tantamount to devastating direct testimony." (*People v. Shipe* (1975) 49 Cal.App.3d 343, 349 [122 Cal.Rptr. 701].) However, defendants failed to object when the questions were asked.

When a defendant complains of prosecutorial misconduct for the first time on appeal we must reject his contention if a timely objection and admonition would have cured the harm. (*People v. Green* (1980) 27 Cal.3d 1, 27-35 [164 Cal.Rptr. 1, 609 P.2d 468], disapproved on another ground in *People v. Hall* (1986) 41 Cal.3d 826, 834 [226 Cal.Rptr. 112, 718 P.2d 99].) Here, defendants failed to object or to request any limiting instruction. We must deem the error waived.

*3. Instruction on Lesser Included Offense.* ■ Defendants argue that the trial court erred in failing to instruct the jury sua sponte on the lesser included offense of second degree murder. ■ The trial court's duty to instruct on the general principles of law relevant to the issues raised by the evidence includes the duty to instruct on lesser included offenses "when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged. [Citations.]" (*People v. Wickersham* (1982) 32 Cal.3d 307, 323-324 [185 Cal.Rptr. 436, 650 P.2d 311].)

■ Here, the evidence would not support the conclusion that the crime was anything less than first degree murder under the felony murder doctrine. The evidence that Burley was robbed was substantial. Except for a small amount of scattered change, no money was found on or near Burley's body, although Burley carried a $20 "bank" to make change for customers. His pants' pockets had been turned inside out. His watch and gold chains were missing. The fragments of conversation overheard by Kurtis Hobel and Lopez indicated that a robbery was taking place. In *People v. Turner* (1984) 37 Cal.3d 302, 327 [208 Cal.Rptr. 196, 690 P.2d 669], overruled on another ground in *Anderson, supra,* 43 Cal.3d at page 1115, the court

stated, "When the evidence points indisputedly [*sic*] to a homicide committed in the course of a felony listed in section 189 of the Penal Code, the court is justified in advising the jury that the defendant was either innocent or guilty of first degree murder. [Citations.]" Thomas's and Boyd's defenses were misidentification and alibi. There was no error.

*4. Evidentiary Rulings.* Defendants contend that the trial court erred in several rulings on evidence. They assert that the trial court should have permitted them to introduce a film of the crime scene, a prior inconsistent statement of Kurtis Hobel, the card he filled out at a lineup and an officer's testimony about his identification of another person at the second lineup. They also claim that it was error to allow evidence that Thomas turned when someone called the name "G-Bo" near the crime scene and evidence about newspaper reports of the crimes.

*a. Film of Crime Scene.* ██ At trial, defendants sought to introduce a film which purportedly reproduced the lighting conditions at the crime scene. The purpose of the film was to demonstrate that Kurtis Hobel could not possibly have seen the events clearly enough to identify the perpetrators. A hearing on the admissibility of the film was held out of the presence of the jury. Robert LeRoy, the cinematographer who created the film, testified that he went to the site several times to take light meter readings, and waited until the moon was full to do the filming. LeRoy consulted with technicians at Eastman Kodak and followed their recommendations as to film speed and type of film. He positioned the camera at the spot where Kurtis Hobel stood and performed the filming from 11:30 p.m. on April 29 to 1 a.m. the next day.

The court viewed the film and ruled that foundational requirements for its admission had not been met. The court explained that it thought the human eye could see more than the film showed, and that no witness testified that the film was an accurate representation of the lighting conditions on the night of the crime. Defendants contend that this ruling was in error.

██ A party who seeks to introduce experimental evidence must show as foundational facts that the experiment was relevant, that it was conducted under conditions the same as or substantially similar to those of the actual occurrence, and that it "will not consume undue time, confuse the issues, or mislead the jury [citation]." (*Culpepper* v. *Volkswagen of America, Inc.* (1973) 33 Cal.App.3d 510, 521 [109 Cal.Rptr. 110].) The party need not, however, show that the conditions were absolutely identical. (*Ibid.*; *People* v. *Bonin* (1989) 47 Cal.3d 808, 847 [254 Cal.Rptr. 298, 765 P.2d 460].) Under Evidence Code section 352, the trial court has wide discretion to

admit or reject experimental evidence. We reverse decisions to admit or exclude such evidence only when the trial court has clearly abused its discretion. (*Culpepper, supra,* 33 Cal.App.3d at p. 522.)

■ LeRoy attempted to reproduce the lighting conditions as best he could; however, he conceded that the angle of the moon was not the same as on the night of the murder. Moreover, he did not position a truck with its headlights on at the scene or reproduce the reflection of light from the chrome grille of a parked car. LeRoy was also unsure whether the foliage on a tree at the site, and the resulting pattern of shadows, were the same in April when he made the film as they had been the previous September. Because the purpose of the film was to demonstrate to the jury the lighting conditions under which witnesses were able to view the events of the crime, these conditions assumed great significance. The trial court reasonably concluded that the lighting conditions portrayed on the film were not sufficiently similar to the lighting conditions on the night of the crime. We find no abuse of discretion.

*b. Kurtis Hobel's Prior Inconsistent Statement.* On the night of the crime, at the end of an interview with a police officer, Kurtis Hobel said something to the effect of "come to think of it, it was like one [of them] was drinking something—it could have been that quart of beer that was lying on the grass next to the pizza man." At trial, Kurtis Hobel testified unequivocally that one assailant held a clear glass bottle in his right hand and drank from it when he approached the victim.

Defense counsel attempted to introduce the interview statement as a prior inconsistent statement. The trial court ruled that the statement was inadmissible. Defendants now argue that this ruling was prejudicial error because the bottle and the fingerprint on it were crucial evidence linking Boyd to the crime, and other evidence linked Thomas to Boyd.

■ A witness's prior statement "is admissible if it tends to contradict or disprove the testimony or *any* inference to be deduced from it. It is enough if the prior statement, taken as a whole, either by what it says, or by what it omits to say, permits the jury to conclude that the witness' true recollection is different from his or her present testimony. [Citations.]" (*People* v. *Loyd* (1977) 71 Cal.App.3d Supp. 1, 9 [139 Cal.Rptr. 693], original italics.) "[I]nconsistency is to be determined, not by individual words alone, but by the whole impression or effect of what has been said or done." (*Ibid.*)

We find no error in the trial court's ruling. The two statements reflect the same recollection of the events surrounding the shooting. There was no inconsistency.

*c. Lineup Card.* Thomas also sought to introduce into evidence the card Kurtis Hobel used in the lineup at which he identified the culprit as someone other than Boyd. He did not indicate in the space provided that Boyd looked familiar or that he doubted the identification. However, at trial, he testified that Boyd had also looked familiar. Thomas offered the card as a prior inconsistent statement. The trial court excluded the card on the basis that silence is not a statement unless a response is called for.

Thomas argues that a response was clearly called for on the card. The witness was asked to fill out the card after viewing the lineup, and one of the items called for was his doubt about the identification. Kurtis Hobel testified that he knew there was a space provided for this purpose, but he failed to use the space to note his doubt about the accuracy of his identification. We agree that the card should properly have been admitted as an inconsistent statement. However, we disagree that the error was prejudicial. Thomas argues that if the jury had had the lineup card in the jury room, it would have served as a concrete reminder that Kurtis Hobel's identification should be discredited. However, Kurtis Hobel testified as to his doubts about the identification and his failure to complete those sections of the card. The card itself would have been merely cumulative.

*d. Testimony About Prior Identification.* Under Evidence Code section 1238[20] Boyd attempted to elicit the testimony of Detective Keith as to how Kurtis Hobel marked his card for the lineup at which Boyd was present. The trial court excluded the evidence.

The rejected evidence related to the witness's identification of a person as a participant in the crime. (Evid. Code, § 1238, subd. (a).) Kurtis Hobel testified that at the time of the lineup, the events of the crime were somewhat fresh in his mind (Evid. Code, § 1238, subd. (b)) and that when he made the identification, he was 75-80 percent certain of it (Evid. Code, § 1238, subd. (c)). It appears that the technical requirements of Evidence Code section 1238 were met, and the evidence should have been permitted.

However, the error was harmless. Kurtis Hobel testified that he identified someone other than Boyd at the lineup. Keith's testimony about the same fact would have been merely cumulative.

---

[20]Evidence Code section 1238 provides: "Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement would have been admissible if made by him while testifying and: [¶] (a) The statement is an identification of a party or another as a person who participated in a crime or other occurrence; [¶] (b) The statement was made at a time when the crime or other occurrence was fresh in the witness' memory; and [¶] (c) The evidence of the statement is offered after the witness testifies that he made the identification and that it was a true reflection of his opinion at that time."

*e. Hearsay Objection.* Defendants assert that the trial court erred in admitting the testimony of VanderVeen that Hayward Demison told him that he saw three Black men running across Highland Avenue and heard someone shout, "G-Bo." The trial court admitted the evidence over defense objection that the statement was hearsay.

We find no error. ▮ An out-of-court statement is inadmissible hearsay if it is offered to prove the truth of the matter asserted (Evid. Code, § 1200, subd. (a)), but may be admissible for another purpose. The challenged evidence purportedly showed that Thomas knew G-Bo because he reacted by turning when he heard the name. The statement was admissible to demonstrate Thomas's state of mind.

*f. Officer Keith's Testimony.* Over objection, Keith testified that he had kept a daily log of the articles in the San Bernardino Sun newspaper and that none of the articles had mentioned Boyd, G-Bo or the weapon used by the assailants. Keith also testified that to his knowledge, none of the other local newspapers had published any articles about the incident. This testimony was offered to discredit Reeves's assertion that everything he told the officer about the crime he had learned through the newspapers or through street gossip.

On appeal, defendants complain that there was no foundation for Keith's testimony about newspaper articles. The error, if any, was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) Several other witnesses, Angelina Garcia, Alexander Garcia, Hayward Demison, and Fred Fuchs, testified that they saw one or the other of the defendants on the afternoon, evening or night of the shooting with a large caliber handgun. Reeves's statement to Keith that he had seen Boyd with such a gun was merely cumulative. Reeves denied that he had made such a statement to Keith. Moreover, if the jury believed that Reeves had made the statement to Keith, the prejudice to Boyd stemmed from the fact that Reeves named Boyd as one of the killers, not from the source of Reeves's information.

*5. Prosecutor's Failure to Disclose Evidence Favorable to Defense.* Over defense objections, the prosecutor twice asked Thomas whether he had told anyone Boyd said he had killed Burley during a struggle which Burley was winning. The court permitted the questioning after the prosecutor represented that he would produce Debbie Nickleberry to testify that Thomas had made this statement to her. Nickleberry was never called as a witness. Thomas denied having made the statement.

At defendants' motion for new trial, Nickleberry testified that she had told VanderVeen she knew Boyd, had seen Thomas around, and had heard

about the killing on the streets and in the newspaper. Nickleberry insisted that she did not tell VanderVeen she had seen or talked to Thomas the day before his arrest or that Thomas had told her that Boyd killed a pizza delivery man. Nickleberry testified that she went to the prosecutor's office twice at his request. The prosecutor first had wanted to know where Reeves had been the night of the crime. In the second visit, Nickleberry was asked whether she had said any of the things listed in VanderVeen's summary of their conversation. She told the prosecutor she had not. The prosecutor then told her she would not be needed.

The prosecutor admitted that the second interview had taken place during the rebuttal case. Through inadvertence he did not tell the defense about it until after trial.

 Intentional or negligent suppression by the prosecution of material evidence on the issue of guilt favorable to the accused violates due process. (*Brady* v. *Maryland* (1963) 373 U.S. 83, 86-87 [10 L.Ed.2d 215, 218, 83 S.Ct. 1194].) The prosecutor must disclose all substantial material evidence (*In re Ferguson* (1971) 5 Cal.3d 525, 532 [96 Cal.Rptr. 594, 487 P.2d 1234]), and his motives and purpose in failing to do so are irrelevant. (*People* v. *Ruthford* (1975) 14 Cal.3d 399, 406 [121 Cal.Rptr. 261, 534 P.2d 1341].) The duty of disclosure extends to evidence that relates to the credibility of key witnesses. (*Ibid.*, *Giglio* v. *United States* (1972) 405 U.S. 150, 154 [31 L.Ed.2d 104, 108-109, 92 S.Ct. 763].)

We conclude that the prosecutor should have informed defendants that Nickleberry denied her earlier statement. We thus examine whether the error requires reversal. When the evidence that was withheld goes to the credibility of a witness, "[t]he defendant must make a showing of substantial materiality and even after this showing is made reversal is not required if the prosecution establishes the failure to disclose was harmless beyond a reasonable doubt." (*Ruthford, supra,* 14 Cal.3d at p. 409.)

Here, defendants argue that Nickleberry's alleged recantation was relevant to VanderVeen's credibility. VanderVeen testified that Miles told him that Miles had been walking between two apartment buildings and had seen Commando, G-Bo and Mimi in front of the buildings. In contrast, Miles testified that he saw a group of men there, but could not recall if Boyd and Thomas were among them. VanderVeen also testified as to the content of his interview with Jeffrey Traylor, contradicting Traylor's testimony about what Boyd had told him he had seen the night of the crime. Finally, VanderVeen testified for the defense as to the content of his interview with Hayward Demison and as to measurements he had taken at the crime scene.

Nickleberry's denial that she made the statements also could have been favorable to Thomas's credibility because he testified that he had never told anyone that Boyd had said he had killed the delivery man during a struggle. However, Nickleberry's denial that she told VanderVeen that Thomas had told her that Boyd had told him he killed Burley in a struggle probably would have been inadmissible. VanderVeen did not testify as to his conversation with Nickleberry, so her recantation could not have been introduced as a prior inconsistent statement. Defendants have not identified any other theory under which her denial could have been introduced.

Moreover, had Nickleberry's denial been introduced, it would only have served to remind the jury of damaging evidence. The trial court stated the issue succinctly. After determining that the prosecutor acted in good faith in questioning Thomas, the court continued, "And when you look at it, there isn't anything that could have been done. The expression on ringing the bell occurs to me. . . . And I think that to then have the . . . so-called impeachment witness take the stand and be asked further details about this would simply continue to ring a bell that had stopped ringing a long time ago. It would only emphasize the fact that there must have been something said out of court. There was talk on the street about Boyd's involvement. It wouldn't have helped. It would have hurt." We conclude that the prosecutor's failure to disclose Nickleberry's recantation was harmless beyond a reasonable doubt.

6. *Prosecutorial Misconduct in Closing Argument.* Boyd and Thomas complain that the prosecutor, Victor Stull, committed prejudicial misconduct in closing argument to the jury.[21] Defendants assert that the argument

---

[21] The prosecutor argued, "One of the interesting things about my job is that you not only see this twisted logic used from time to time, *but you get an incredible insight into human nature.* It's what fascinates me about my job. You see people at their absolute worst. I've seen men who have raped, had intercourse with their three-year old daughters, physical damage was so much that it literally tore their vagina back to the area of the anal—." (Italics added.) Defense counsel then interposed an objection that the line of argument had nothing to do with this case. The court ruled, "It's not inflammatory, but it could be, but it's within the bounds of reasonable argument. Overruled."

The prosecutor then continued, "I've seen cases where teenagers have plotted the murder of one of their good friends and pumped round after round of .22-caliber bullets into their body, although he's not dead, and picked him up and said: You're beautiful. And shot him in the temple. I've seen cases of petty theft, people robbing to support a drug habit. You see people at the absolute worst. And you see people at their absolute best. You see people like Officer Armstrong, I.D. Detective Cravens, Detective Keith, Detective Kutch, others who carry on a thankless job. But they do the best job that they can. You see people like Angelina Garcia and others like her who probably are not well educated and haven't had the best breaks of life, perhaps, but they go on. They try to do the best they can. Angelina Garcia is a kind of woman who maybe she made mistakes in raising her sons. She had Johnny Demison in prison. There was some reference to Constantino Hall having some trouble with the law. Her other son. They didn't stop there. One of the neatest things, most encouraging things I

constituted improper vouching for prosecution witnesses' credibility and an improper comparison of defendants to the more depraved criminals the prosecutor had encountered.

We first address the issue of vouching for witnesses' credibility. ▮ The prosecutor has wide latitude to argue from reasonable deductions and inferences based on the evidence to bolster witnesses' credibility. (*People* v. *Gates* (1987) 43 Cal.3d 1168, 1188 [240 Cal.Rptr. 666, 743 P.2d 301].) However, it is improper for the prosecutor to argue based on his experience with people and witnesses, implying superior knowledge from sources unavailable to the jury. (*People* v. *Bolton* (1979) 23 Cal.3d 208, 213 [152 Cal.Rptr. 141, 589 P.2d 396]; *People* v. *Adams* (1960) 182 Cal.App.2d 27, 34 [5 Cal.Rptr. 795].).) Here, the prosecutor first informed the jury that he had gained "incredible insight into human nature" from his experience, and then assured them that Angelina Garcia and her son were "the kinds of people that you can trust." We have no difficulty concluding that the prosecutor used his personal belief to bolster the credibility of his witnesses. Such argument was manifestly improper. (*People* v. *Perez* (1962) 58 Cal.2d 229, 246 [23 Cal.Rptr. 569, 373 P.2d 617, 3 A.L.R.3d 946], disapproved on another ground in *Green, supra,* 27 Cal.3d at pp. 32-33.)

However, except for one objection on the basis of relevancy, defendants did not object to the challenged argument. ▮ A defendant waives error if he fails to object to prosecutorial misconduct at trial or to request an admonition, and such an issue may be raised on appeal only if the trial court could not have cured the harm by a prompt admonition to the jury. (*Green, supra,* 27 Cal.3d at p. 27.) In this case, on a properly framed objection, the trial court could have curtailed any impermissible vouching for witnesses. We conclude that any error arising from the prosecutor's argument was waived because an admonition from the court would have cured the harm. (*People* v. *Fosselman* (1983) 33 Cal.3d 572, 581 [189 Cal.Rptr. 855, 659 P.2d 1144].)

Defendants argue that their relevancy objection was sufficient to preserve the issue, and because the trial court overruled the relevancy objection, any

heard in this case was Mr. Ames, I think, asked Alexander Garcia if he left his house the date of the 9th of September, and Alexander said no, my mom put me on restriction. I couldn't go anyplace that day except for 30 minutes. I said good, good for her, because she maybe made mistakes, but she's still trying. She's the kind of woman, although her situation may not be the best, she keeps trying. She has inner courage just to go on day by day, to try to do what is right, to try to raise Alexander, her youngest son, as well as she can, the kind of woman who knows right from wrong, who tells Alexander: If you made a mistake, you're going to be on restriction; the kind of woman who comes into court and says: I saw this. *That is the kind of woman that you can believe. And her son, hopefully, will also have that kind of integrity. I think he displayed it on the witness stand. He testified just as truthfully as he could. Didn't exaggerate things. Those are the kinds of people that you can trust."* (Italics added.)

further objection would have been futile. (See, e.g. *People* v. *Antick* (1975) 15 Cal.3d 79, 95 [123 Cal.Rptr. 475, 539 P.2d 43], disapproved on another ground in *Castro, supra*, 38 Cal.3d at pp. 306-312.) Thus, they assert, the issue is properly before this court on appeal. We disagree. First, an objection must inform the court of the specific ground on which it is based. (Evid. Code, § 353, subd. (a).) The relevancy objection did not inform the court that defendants considered the prosecutor's argument to be improper vouching for the credibility of a witness. Moreover, the objection was raised before the prosecutor even began to discuss witnesses' credibility, and the court could not have anticipated the direction of the argument.

Second, the court did not show any inclination to allow the prosecutor to argue without restriction. The court acknowledged that the argument could be inflammatory, but stated that it had not exceeded the bounds of reasonable comment. The court's comment indicates to us that the court would have sustained an appropriate objection.

■ Defendants next argue that the prosecutor improperly compared them to the more depraved criminals he had encountered. The prosecutor mentioned the facts of several heinous crimes he had prosecuted; however, he stopped short of drawing a comparison between defendants here and the defendants in those cases.

If a prosecutor's derogatory remarks are reasonably related to or descriptive of the criminal acts shown by the evidence, they will usually be held to come within the scope of legitimate argument. (*People* v. *Wein* (1958) 50 Cal.2d 383, 396 [326 P.2d 457], overruled on other grounds in *People* v. *Daniels* (1969) 71 Cal.2d 1119, 1140 [80 Cal.Rptr. 897, 459 P.2d 225, 43 A.L.R.3d 677] and *Green, supra*, 27 Cal.3d at p. 32.) To the extent the prosecutor drew on other cases for examples of cold-blooded behavior, the characterization was justified. The evidence in this case showed unequivocally that the killers shot an unarmed man at point-blank range with no provocation. Although the prosecutor's remarks skirted the boundaries of fair comment, we conclude that they did not constitute misconduct.

### BOYD'S CONTENTIONS

*1. Bad Faith of Prosecutor.* Boyd asserts that the prosecutor committed prejudicial misconduct by twice asking Thomas on cross-examination if Boyd had ever told him that Boyd shot Burley because they were wrestling and Burley was winning. Boyd contends that the only basis for the prosecutor's belief that such a conversation took place was that Denise Nickleberry had purportedly told the investigator so. Boyd argues that because the prosecutor had not himself interviewed Nickleberry before he asked those

questions, he had no basis for a good faith belief that the conversation took place.

■ It is improper for a prosecutor to ask questions which suggest the existence of facts harmful to the defense unless the prosecutor has a good faith belief that the questions will be answered in the affirmative or that the underlying facts can be proved. (*People* v. *Blackington* (1985) 167 Cal.App.3d 1216, 1221 [213 Cal.Rptr. 800].) However, the prosecutor may properly rely on the results of investigations reported to him by others. It would be unrealistic to require the prosecutor personally to interview every witness before the prosecutor can rely on statements the witness made to an investigator. We see no basis in this record for inferring that when the prosecutor asked the question he did not believe the underlying facts to be true.

## THOMAS'S CONTENTIONS

*1. Suggestive Lineup.* Thomas argues that the trial court erred in admitting Kurtis Hobel's in-court identification of Thomas because it was tainted by an unduly suggestive pretrial lineup. On December 4, 1987, Kurtis Hobel, Lopez and Evans viewed a live lineup at the police station. Before the lineup participants entered, an officer in the viewing room with the witnesses received a phone call, during which he said number 5 would go into discipline. Kurtis Hobel testified that he did not recall that being said; however, another observer sitting further away heard the words.

The lineup participants, except for Thomas, then filed onto the stage in numerical order. Thomas, wearing number 5, did not go onto the stage until the others were already in their places. When Thomas finally came out, he hung his head, moved it back and forth and continued to look at the floor for some seconds. Kurtis Hobel identified Thomas as one of the assailants. Kurtis Hobel testified that he looked at all of the lineup participants an equal length of time. Lopez and Evans were unable to make an identification.

Thomas now argues that the lineup was impermissibly suggestive. He contends that both the deputy's comment about number 5 going into discipline and Thomas's own conduct focused undue attention on him.

*a. Deputy's Remarks During Lineup.* ■ A lineup which is impermissibly suggestive and gives rise to a substantial likelihood of irreparable misidentification is a denial of due process of law. (*Neil* v. *Biggers* (1972)

409 U.S. 188, 196 [34 L.Ed.2d 401, 409, 93 S.Ct. 375]; *People* v. *Hunt* (1977) 19 Cal.3d 888, 893-894 [140 Cal.Rptr. 651, 568 P.2d 376].) "Suggestive comments or conduct that single out certain suspects or otherwise focus a witness's attention on a certain person in a lineup can cause such unfairness so as to deprive a defendant of due process of law. [Citation.]" (*People* v. *Perkins* (1986) 184 Cal.App.3d 583, 588 [229 Cal.Rptr. 219].)

We thus determine whether the lineup procedure was impermissibly suggestive under the totality of the circumstances in this case. (*Biggers, supra,* 409 U.S. at pp. 196-199 [34 L.Ed.2d at pp. 409-411].) A trial court's finding that a challenged identification procedure was proper binds this court if supported by substantial evidence. (*People* v. *Savala* (1981) 116 Cal.App.3d 41, 49 [171 Cal.Rptr. 882].) All evidentiary conflicts must be resolved in favor of the court's findings. (*Perkins, supra,* 184 Cal.App.3d at p. 589.)

In his motion to exclude the identification, Thomas argued that the officer's comments in the lineup room to the effect that number 5 would go into discipline unfairly brought Thomas to the witnesses' attention. However, in ruling on the motion the court noted, "[W]e do have some conduct by the police that certainly is not approved and may be, if this suggestion were received by the witness who did the identifying, then we have an issue that really needs to be dealt with. *But it seems that, according to the testimony, the witness wasn't even aware of it, so that it doesn't seem to have caused any suggestion, let alone an impermissible one.*" (Italics added.) Although the evidence could support a contrary conclusion, we resolve the evidentiary conflict in favor of the court's finding. (*Perkins, supra,* 184 Cal.App.3d at p. 589.) We determine that substantial evidence supports the trial court's finding. It necessarily follows, therefore, that the way the lineup was conducted did not deprive Thomas of his right to due process.

*b. Thomas's Conduct During Lineup.* ▮ We next consider whether Thomas's own conduct, in failing to enter the stage in proper order and in shaking his head during the lineup caused the lineup to be constitutionally unfair. It is apparently a case of first impression in this state whether a defendant may challenge a lineup when his own conduct has caused the procedure to be suggestive. However, California courts have indicated in dicta that it must be *police* conduct which causes the procedure to be suggestive. (See, e.g., *People* v. *Williams* (1973) 9 Cal.3d 24, 37 [106 Cal.Rptr. 622, 506 P.2d 998]; *People* v. *Peggese* (1980) 102 Cal.App.3d 415, 422 [162 Cal.Rptr. 510].)

Courts in other jurisdictions have uniformly rejected the proposition that a defendant may claim constitutional error based on his own actions. (See,

e.g., *State* v. *Kirk* (Mo. 1982) 636 S.W.2d 952, 955 ["A pretrial lineup will not be deemed impermissibly suggestive where any suggestiveness was due to defendant's own contumacy and personal refusal to behave unobtrusively. [Citation.]"]; *People* v. *Nelson* (1968) 40 Ill.2d 146 [238 N.E.2d 378, 382] ["It is plain too, and does not require discussion that if the defendant stood out, . . . and attracted attention to the lineup proceedings it was not because of any suggestive conduct by the police but was attributable to his own behavior . . ."].) We agree with these decisions; a defendant may not base his claim of deprivation of due process in a lineup on his own behavior. We likewise reject the notion that the police had any obligation to control Thomas's behavior so as to prevent him from drawing undue attention to himself.

*2. Flight Instruction.* The trial court instructed the jury under CALJIC No. 2.52 that "The flight of a person immediately after the commission of a crime or after he is accused of a crime is not sufficient in itself to establish his guilt. But it's a fact which if proved may be considered by you in light of all the other proved facts in deciding the questions of his guilt or innocence." Thomas argues that the trial court erred in failing to instruct the jury that the flight instruction applied only to Boyd. Thomas contends that there was no evidence that he fled, and his defense was alibi.

Thomas cites authorities which indicate that it is error to give the flight instruction when, as here, the identity of the perpetrator is contested (e.g., *People* v. *Martinez* (1989) 207 Cal.App.3d 1204, 1215 [255 Cal.Rptr. 691]). Here, however, substantial evidence supported giving the instruction as to Thomas. Hayward Demison testified that he had seen Thomas and two others, one of whom had a gun, running about three blocks away from the crime scene after Demison had heard a gunshot. ▆▆▆ Recent decisions have clarified that "a flight instruction is appropriate where there is substantial evidence of flight by the defendant *apart from his identification as the perpetrator,* from which the jury could reasonably infer a consciousness of guilt." (*People* v. *Rhodes* (1989) 209 Cal.App.3d 1471, 1476 [258 Cal.Rptr. 71], original italics; accord *People* v. *Batey* (1989) 213 Cal.App.3d 582, 587 [261 Cal.Rptr. 674].) There was no error in giving the flight instruction as to Thomas.

*3. Section 654.* ▆▆▆ The trial court imposed a one-year term for Thomas's robbery conviction, to be served consecutive to the indeterminate sentence for murder. Thomas argues that the trial court erred in failing to stay the sentence for robbery under section 654, which forbids double punishment for the same act, because the act of robbery was the same act which made the killing first degree murder. In *People* v. *Mulqueen* (1970) 9

Cal.App.3d 532 [88 Cal.Rptr. 235], the court suspended the sentence for robbery when the defendant had been convicted of both robbery and murder in the first degree. The court stated, "It is clear from the record here that there was but one act and that the act of robbery was the act which made the homicide first degree murder." (*Id.*, at p. 547; accord *People* v. *Magee* (1963) 217 Cal.App.2d 443, 470-472 [31 Cal.Rptr. 658]; see also *People* v. *Milan* (1973) 9 Cal.3d 185, 196-197 [107 Cal.Rptr. 68, 507 P.2d 956].)

The Attorney General relies on cases which involve an *attempted* murder or *assault* after the completion of a robbery. Such cases hold that if the two acts are separate and distinct, they merit multiple punishment. (*People* v. *Coleman* (1989) 48 Cal.3d 112, 116-117 [255 Cal.Rptr. 813, 768 P.2d 32]; *People* v. *Beamon* (1973) 8 Cal.3d 625, 637-639 [105 Cal.Rptr. 681, 504 P.2d 905]; *People* v. *Massie* (1967) 66 Cal.2d 899 [59 Cal.Rptr. 733, 428 P.2d 869].) These cases are distinguishable, however, because a felony, here robbery, is a statutorily defined element of the crime of felony murder, but not of attempted murder. The separate sentences violate section 654. We therefore stay imposition of the one-year term for Thomas's robbery conviction.[22] (*People* v. *Brown* (1989) 212 Cal.App.3d 1409, 1427 [261 Cal.Rptr. 262].)

*4. Failure to State Reasons for Consecutive Sentences.* The trial court sentenced Thomas on other matters at the sentencing hearing in this case, including a five-year sentence for a violation of Health and Safety Code section 11352 in case No. SCR 45212, to be served consecutively to the indeterminate sentence for murder. ▉ Thomas asserts that the trial court failed to state adequate reasons for the consecutive term. (*People* v. *Gulbrandsen* (1989) 209 Cal.App.3d 1547, 1552 [258 Cal.Rptr. 75].) Here, the court referred to Thomas's background as a reason for the sentence choice. Thomas's "background," as reflected in the probation report, reflects numerous convictions of increasing severity. (Cal. Rules of Court, rule 425(a)(5).) We find no error.

### DISPOSITION

The judgment as to Boyd is affirmed. As to Thomas, the convictions are affirmed; we modify the judgment as follows: execution of the sentence on count 2 (robbery) is stayed pending the finality of the judgment and service

---

[22] Our finding of error under section 654 affects only the consecutive sentence for robbery. The consecutive determinate sentence for Thomas's conviction of a violation of Health and Safety Code section 11352 in case number SCR 45212 still stands.

of the remainder of the sentence, said stay to become permanent upon completion of the terms imposed on all other counts.

Hollenhorst, Acting P. J., and Timlin, J., concurred.

Appellants' petitions for review by the Supreme Court were denied October 30, 1990. Mosk, J., was of the opinion that the petitions should be granted.