Filed 1/10/14  P. v. Bautista CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| THE PEOPLE, | B244063 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA314454) |
| v. | |
| ERICK BAUTISTA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lance A. Ito, Judge.  Affirmed as modified.

Eric R. Larson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, and David A. Voet, Deputy Attorney General, for Plaintiff and Respondent.

_____

Defendant and appellant Erick Bautista was convicted in count 1 of murder (Pen. Code, § 187, subd. (a)),[1] in count 2 of second degree commercial burglary (§ 459), in count 3 of attempted robbery (§§ 664, 211), and in count 5 of forgery (§§ 475, subd. (c), 476).[2] The jury found true the allegations that defendant committed the murder while engaged in commercial burglary and attempted robbery (§ 190.2, subd. (a)(17)), a principal personally used, intentionally discharged, and proximately caused great bodily injury or death with a firearm (§ 12022.53, subds. (b)-(e)), and the offenses were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(A)).[3]

Defendant was sentenced to state prison for 50 years to life on count 1, consisting of 25 years to life for the first degree murder conviction and 25 years to life for the firearm enhancements. A determinate term of 16 years 4 months in prison was imposed as follows: three years for count 3, plus ten years for the gang enhancement; a consecutive eight months for count 2, plus one year for the gang enhancement; and a consecutive eight months for count 5, plus one year for the gang enhancement.

Defendant contends: (1) his combined sentences constitute cruel and unusual punishment; (2) the sentences in counts 2, 3, and 5 must be stayed under section 654; (3) the firearm enhancements for counts 2 and 5 must be stricken; and (4) the abstract of judgment must be corrected to reflect the trial court's oral pronouncement that restitution be joint and several with his codefendants. The Attorney General concedes, and we agree, that the sentence in count 5 must be stayed, the firearm enhancements for counts 2

---

[1] All further statutory references are to the California Penal Code unless otherwise specified.

[2] Count 4 (forgery, §§ 475, subd. (c), 476) and count 6 (receiving stolen property, § 496, subd. (a)) and the attached enhancements were dismissed pursuant to section 1118.1.

[3] Codefendants Steven Cuellar and Christian Vega were tried separately. Defendant and codefendant Oscar Olloqui were tried jointly but with separate juries.

and 5 must be stricken, and the abstract of judgment must be corrected to reflect that restitution is joint and several.  In all other respects, the judgment is affirmed.

## FACTS

*Prosecution*

On October 19, 2006, Injun Cho's print shop was burglarized.  Blank checks were among the items stolen.  Cho closed the account five days after the burglary.  Codefendant Oscar Olloqui had possession of some of the checks.

Prior to November 2006, Sam and Simon Khalil regularly cashed checks drawn from Cho's print shop at the market they owned.  They stopped cashing checks from the print shop after several of the checks were returned unpaid.

In the early afternoon of November 2, 2006, Simon was working at the counter and Sam was behind a door in the restaurant section of the market.  Sam heard codefendant Steven Cuellar demand that Simon hand over "all the money."  Defendant aimed a shotgun at Simon, and Cuellar pointed a handgun at him.  Approximately five seconds later, Sam heard a gunshot.  Sam entered the market and saw Simon unconscious on the ground.  Defendant and Cuellar fled the market.  Sam called 911.  Simon died as a result of the gunshot wound.

While Karla Medina was stopped at a red light at the intersection of Maple Avenue and 30th Street, she heard a gunshot from inside a nearby market.  She saw defendant and Cuellar walk out of the market and heard someone scream.  Defendant and Cuellar began running down Maple Avenue.  Defendant put an object that resembled a gun into a backpack.  Medina followed them in her car on Maple Avenue.  She saw Olloqui and codefendant Christian Vega sitting inside a dark-colored SUV parked on Maple.  Defendant and Cuellar got into the SUV, and the vehicle sped away.  Medina called 911.

3

Nathaniel Barnes was walking to the market on the day of the shooting. He walked by two men. One of the men wore a white shirt, and the other wore dark clothes and carried a backpack. The men stopped, and the one with the backpack squatted down and told the other man to get something. As Barnes continued down the street, he saw two men in a dark SUV. The men saw him and told him to keep walking. Barnes went into the market a few minutes later and saw Simon on the floor.

The market's surveillance videotape showed defendant and Cuellar entering the market. Cuellar wore a white shirt and a black back brace, and defendant wore a black jacket and carried a black backpack. Cuellar attempted to cash a check, Simon refused, and a confrontation ensued. Defendant pointed a sawed-off shotgun at Simon and Cuellar pointed a handgun at him. Cuellar shot Simon, and he and defendant ran out of the market. The jury was shown a videotape of an earlier incident in which Cuellar cashed a check at the market.

On December 20, 2006, officers arrested Cuellar at his home. They seized a .38-caliber semiautomatic pistol, a sawed-off shotgun, and shotgun ammunition.

Defendant was arrested at home on December 22, 2006. He was interviewed by Detective Sunny Romero of the Los Angeles Police Department. Defendant admitted belonging to the Playboys gang and using the monikers "Panic" and "Whisper." At first he denied he was involved in the shooting, but he later confessed he went into the market with Cuellar. He wanted to cash a check, but he did not intend to rob the market, and he did not know that Cuellar was going to shoot Simon. He could not explain why he aimed a shotgun at Simon.

Codefendants Olloqui, Vega, and Cuellar were also members of the Playboys gang. Officer Ronald Bernard testified as an expert on the gang.

Among other things, Officer Bernard opined that: "In order to exist . . . the gang has to be violent . . . . If they're confronted by a victim, a witness, [or] a rival gang member, they . . . have to deal with that individual. The harsher [they deal] with [the] individual, the more respect . . . gain[ed,] not only from that particular individual or individuals who may witness this particular act, but from the gang members whom they

4

may be with at the time or whom they tell about this particular act." A gang member cannot back down when confronting a victim without losing status in the gang. A young member would gain trust and respect within the gang if he pointed a gun at a victim. The crimes would be committed in association with and for the benefit of the gang.

### *Defense*

Gang expert Martin Flores opined that defendant was not a member of the Playboys gang but instead belonged to the 51st Street gang where defendant lived. Flores testified that it would be unlikely for members of different gangs to commit the crimes charged together. In a hypothetical situation reflecting the prosecution's case, Flores believed the evidence was insufficient to establish the crimes were gang-related.

Dr. Ronald Fairbanks evaluated defendant. Defendant has an IQ of 65, which put him in the bottom two percent of the population. Although defendant was 16 at the time the crimes were committed, he had the mental capabilities of a 10-year-old. Dr. Fairbanks performed other tests on defendant and concluded that defendant had a strong tendency to follow others and comply with requests. He believed defendant's judgment, reasoning, and ability to understand situations could have been impaired when the crimes took place.

### *Rebuttal*

Psychiatrist Kaushal Sharma also evaluated defendant. He reviewed defendant's medical records and interviewed defendant. Based on records and defendant's odd and uncooperative behavior during the interview, Dr. Sharma opined that he was "intentionally and consciously trying to present symptoms which are not there for the purpose of deceiving the examiner because he has something to gain by such deception." He found no evidence that defendant was mildly retarded or had a mental defect.

5

**DISCUSSION**

*Cruel and Unusual Punishment*

Defendant contends that as a juvenile offender, he is entitled to a new sentencing hearing because his sentence of 16 years 4 months plus 50 years to life amounts to a de facto sentence of life without parole, which violates the prohibition against cruel and unusual punishment under the state and federal Constitutions. We conclude the new procedures created by Senate Bill No. 260 (2013-2014 Reg. Sess.) (SB 260) will afford defendant a meaningful opportunity for release on parole within his lifetime, abrogating any need for resentencing.

"'The Eighth Amendment's prohibition of cruel and unusual punishment "guarantees individuals the right not to be subjected to excessive sanctions." [Citation.] That right . . . "flows from the basic 'precept of justice that punishment for crime should be graduated and proportioned'" to both the offender and the offense.'" (*In re Alatriste* (2013) 220 Cal.App.4th 1232, 1237 (*Alatriste*), citing *Miller v. Alabama* (2012) 567 U.S. ___, ___ [183 L.Ed.2d 407, 132 S.Ct. 2455, 2463] (*Miller*).)

The United States Supreme Court has recognized that children differ from adults in their culpability and in their ability to reform and must be sentenced in accordance with those differences. (*Alatriste*, *supra,* 220 Cal.App.4th at pp. 1238-1240.) Accordingly, it has held that under the Eighth Amendment, juvenile offenders may not be subjected to the most serious penalties, including the death penalty (*Roper v. Simmons* (2005) 543 U.S. 551 (*Roper*)), life without parole in non-homicide cases (*Graham v. Florida* (2010) 560 U.S. 48 (*Graham*)), and mandatory life without parole in homicide cases (*Miller, supra,* 567 U.S. at p. ___ [132 S.Ct. 2455]). Following this precedent, our own Supreme Court held that imposition of a sentence to a term of years that amounts to de facto life without parole also constitutes cruel and unusual punishment in homicide cases involving juvenile offenders. (*People v. Caballero* (2012) 55 Cal.4th 262, 268 (*Caballero*).)

6

The application of these decisions has been problematic. As noted in *Alatriste*, "the directives of *Graham*, *Miller* and *Caballero* have proved challenging for trial courts. The Legislature has enacted statutes designed to ensure lengthy prison sentences for defendants who commit serious and/or violent felonies. These sentencing statutes, particularly those requiring trial courts to impose certain sentence enhancements, limit a trial court's sentencing options. When sentencing a juvenile defendant, a trial court, while accommodating this statutory framework, must consider objective factors such as the defendant's age, level of participation in the crime and, to a certain extent, life experiences. However, the court must also evaluate subjective factors, such as the defendant's 'physical and mental development,' (*Caballero*, *supra*, 55 Cal.4th at p. 269) in order to determine when the defendant might attain a sufficient level of maturity to warrant release on parole. The court must then fashion a sentence that gives the defendant a meaningful opportunity for release on parole during his or her lifetime, and must utilize actuarial skills to determine how long the defendant's lifetime might be." (*Alatriste*, *supra,* 220 Cal.App.4th at p. 1238, fn. omitted.)

The United States Supreme Court outlined the contours of the Eighth Amendment protections with respect to the responsibilities of the states in *Graham*: "A State is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime. What the State must do . . . is give defendants . . . some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. It is for the State, in the first instance, to explore the means and mechanisms for compliance. It bears emphasis, however, that while the Eighth Amendment forbids a State from imposing a life without parole sentence on a juvenile nonhomicide offender, it does not require the State to release that offender during his natural life. Those who commit truly horrifying crimes as juveniles may turn out to be irredeemable, and thus deserving of incarceration for the duration of their lives. The Eighth Amendment does not foreclose the possibility that persons convicted of nonhomicide crimes committed before adulthood will remain behind bars for life. It does forbid States from making the judgment at the outset that those offenders never will be fit to reenter society." (*Graham, supra,* 560 U.S. at p. 75.)

7

Because *Miller* (prohibition on mandatory life without parole sentences in homicide cases involving juvenile offenders) and *Caballero* (imposition of a term of years that is a de facto life without parole sentence prohibited in non-homicide cases involving juvenile offenders) effectively extend the protections of *Graham* to juvenile homicide offenders in cases like this, *Graham's* guidelines are equally applicable here.

Our Legislature responded to *Graham*'s guidance with the enactment of SB 260, which will take effect on January 1, 2014. SB 260 requires the Board of Parole Hearings to conduct a youth offender parole hearing to consider release of offenders who committed specified crimes prior to being 18 years of age and who were sentenced to state prison. (§ 3051, subd. (b)(l), as amended by Stats. 2013, 1st Ex. Sess., ch. 5.) Pertinent here, "[a] person who was convicted of a controlling offense that was committed before the person had attained 18 years of age and for which the sentence is a life term of 25 years to life shall be eligible for release on parole by the board during his or her 25th year of incarceration at a youth offender parole hearing the bill makes a person eligible for release on parole at a youth offender parole hearing during the 25th year of incarceration if the person received a sentence of 25 years to life."[4] (*Id.*, subd. (b)(3).) The bill mandates that the board, in reviewing a prisoner's suitability for parole, give great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner in accordance with relevant case law. It requires that, in assessing growth and maturity, psychological evaluations and risk assessment instruments, if used by the board, be administered by licensed psychologists employed by the board. (*Id.*, subd. (f)(1).)

We conclude the safeguards provided by SB 260 adequately protect defendant's Eighth Amendment rights, "insur[ing] that prisoners such as [himself], who were juveniles at the time they committed their life crimes, will have the benefit of the type of

---

[4] A "controlling offense" is "the offense or enhancement for which any sentencing court imposed the longest term of imprisonment." In this case, the controlling offense is murder, for which defendant received a sentence of 25 years to life. Thus, the statute applies to defendant.

evaluation compelled by *Miller*, *Graham* and *Caballero* at a point in time that gives them a meaningful opportunity to 'obtain release based on demonstrated maturity and rehabilitation.' (*Graham*, *supra*, 560 U.S. at p. 75.)" (*Alatriste*, *supra*, 220 Cal.App.4th at pp. 1239-1240.)

Defendant's argument that *Miller*, *supra*, 567 U.S. at page ___ [132 S.Ct. at p. 2469] requires the sentencing judge to consider individualized factors applicable to juvenile offenders "before concluding that life without [the] possibility of parole [is] the appropriate remedy" is unavailing. Even if we were to interpret *Miller* in the way defendant suggests, here the sentencing judge considered defendant's participation and role in the commission and planning of the crimes, his age, maturity, subsequent growth and conduct during the course of the extended trial, and his asserted mental impairment. The sentencing court then exercised its discretion to sentence defendant to 25 years to life on the murder count rather than life without parole. Defendant realized the benefit of thorough consideration of factors relevant to his youth and culpability at sentencing, and will be given another meaningful opportunity to show that he is capable of growth and rehabilitation within his lifetime, as the Eighth Amendment requires.

Defendant's argument that the provisions of SB 260 offer him little practical protection because there is no guarantee the provisions will still be in effect in 25 years is also without merit. Regardless of whether SB 260 is in effect at that time, the protection defendant seeks is guaranteed to him under the state and federal Constitutions, and must be provided to him, whether it is in the form of SB 260 or some future legislation.

### *Imposition of Separate Sentences for Forgery, Burglary, and Attempted Robbery*

Defendant contends the trial court was statutorily required to stay the terms for his commercial burglary, attempted robbery, and forgery convictions pursuant to section 654, which prohibits multiple punishment for a single act.

Section 654, subdivision (a) provides, in pertinent part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the

9

provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." "In *Neal v. State of California* (1960) 55 Cal.2d 11, this court construed the statute broadly: '"Section 654 has been applied not only where there was but one 'act' in the ordinary sense . . . but also where a course of conduct violated more than one statute and the problem was whether it comprised a divisible transaction which could be punished under more than one statute within the meaning of section 654." [Citation.] [¶] Whether a *course of criminal conduct* is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the *intent and objective* of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' (*Id*. at p. 19, italics added.)" (*People v. Rodriguez* (2009) 47 Cal.4th 501, 507.)

"The question whether section 654 is factually applicable to a given series of offenses is for the trial court, and the law gives the trial court broad latitude in making this determination. Its findings on this question must be upheld on appeal if there is any substantial evidence to support them." (*People v. Hutchins* (2001) 90 Cal.App.4th 1308, 1312 (*Hutchins*).) "When a trial court sentences a defendant to separate terms without making an express finding the defendant entertained separate objectives, the trial court is deemed to have made an implied finding each offense had a separate objective." (*People v. Islas* (2012) 210 Cal.App.4th 116, 129.) "'"'We must 'view the evidence in a light most favorable to the respondent and presume in support of the [sentencing] order the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]' [Citation.]" [Citation.]' (*Hutchins*, *supra*, 90 Cal.App.4th at pp. 1312-1313.)" (*People v. Tarris* (2009) 180 Cal.App.4th 612, 626-627.)

With respect to the forgery conviction, the Attorney General concedes, and we agree, the sentence must be stayed because defendant's commercial burglary conviction was based upon his entry into the market with the intent to commit forgery. (*People v. Hester* (2000) 22 Cal.4th 290, 294 [trial court may not sentence a defendant for burglary

10

and underlying felony where entry was for the purpose of accomplishing the underlying felony]; *People v. Cline* (1998) 60 Cal.App.4th 1327, 1336 [burglary and theft].)

As to the commercial burglary and attempted robbery convictions, defendant argues that section 654 bars consecutive sentencing because those crimes are the underlying felonies for his murder conviction. We disagree.

Defendant is correct that where the prosecution relies *solely* on the felony-murder theory, the trial court is prohibited from sentencing defendant consecutively for the murder and underlying felony. (*People v. Meredith* (1981) 29 Cal.3d 682, 695-696; *People v. Boyd* (1990) 222 Cal.App.3d 541, 575-576 (*Boyd*); *People v. Mulqueen* (1970) 9 Cal.App.3d 532, 547; *People v. Magee* (1963) 217 Cal.App.2d 443, 470-472.) This is because the underlying felony "is a statutorily defined element of the crime of felony murder" (*Boyd*, *supra*, at p. 576), and thus the underlying felony is "the same act which made the killing first degree murder." (*Id*. at p. 575.) When, as here, a jury has been instructed on murder under felony-murder and premeditation and deliberation theories, however, the trial court is not precluded from finding defendant had separate objectives in committing the killing and the underlying felony, because the jury could have convicted defendant under either theory. (*People v. Osband* (1996) 13 Cal.4th 622, 730-731.) The appropriate standard in such a circumstance is whether substantial evidence supports the trial court's determination defendant harbored more than one objective. (*Ibid*.)

Viewing the evidence in the light most favorable to the judgment, the trial court could reasonably find that defendant entered the store intending to commit the burglary, and nothing more. Defendant's own statement after his arrest supports this view of the evidence, since he told the detective he entered the store to cash the check and not with the intent to commit robbery. The record supports the inference that when Simon refused to cash the check, defendant and Cuellar formed a new and distinct intent to attempt an armed robbery. Under this view of the events, section 654 did not require a stay of the attempted robbery sentence. The trial court could also find that when Simon did not respond to the attempted robbery, defendant and Cuellar decided to shoot and kill Simon

11

to avoid identification and to further their status as gang members, as described by Officer Bernard. Viewed in this fashion, the court could impose sentences for attempted robbery and murder without running afoul of section 654. Accordingly, the trial court did not err in imposing consecutive sentences for defendant's commercial burglary and attempted robbery convictions.

***Firearm Enhancements***

We agree with the parties that the firearm enhancements for the commercial burglary and forgery must be stricken. Because second degree burglary and forgery are not included in the list of applicable crimes subject to enhancement under section 12022.53, subdivision (a), the enhancements were unauthorized. (*People v. Price* (2004) 120 Cal.App.4th 224, 243 ["A sentence is unauthorized when it could not lawfully be imposed under any circumstances in the particular case."].) The judgment shall be modified to strike, rather than stay, the firearm enhancements as to those crimes. (*People v. Scott* (1994) 9 Cal.4th 331, 354 [an unauthorized sentence is subject to correction when it comes to the attention of the reviewing court]; *People v. Ross* (1994) 28 Cal.App.4th 1151, 1160 [remand is not necessary where there is no need for the trial court to exercise discretion].)

***Restitution***

We also agree with the parties the abstract of judgment should be corrected to reflect the trial court's oral pronouncement of judgment that the section 1202.4, subdivision (f) restitution order is joint and several as to defendant and the other perpetrators. (*People v. Neely* (2009) 176 Cal.App.4th 787, 800; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1183.)

## DISPOSITION

The trial court is directed to prepare a corrected abstract of judgment to properly reflect: (1) defendant's sentence in count 5 (forgery) is stayed pursuant to section 654; (2) the section 12022.53 firearm enhancements in counts 2 (commercial burglary) and 5 (forgery) are stricken; and (3) the section 1202.4, subdivision (f) restitution order is joint and several as to defendant and the other perpetrators. The trial court shall forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.


KRIEGLER, J.


I concur:


TURNER, P. J.

13

MOSK, J., Concurring


I concur.

I agree with Justice Breyer that a juvenile should not be sentenced to life without the possibility of parole if he or she did not kill or intend to kill because "'transferred intent' is not sufficient to satisfy the intent to murder that could subject a juvenile to a sentence of life without parole." (*Miller v. Alabama* (2012) 576 U.S. __, __, 132 S.Ct. 2455, 2476 (Breyer, J., concurring.)  Here, the defendant is, in a sense, subject to such a sentence.  I concur because of SB 260, reserving the right to change my position based on how that statute is implemented and operates in the future.


MOSK, J.