Filed 10/14/15  P. v. Wagner CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D068061 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FWV1103299) |
| ANTHONY MICHAEL WAGNER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino County, Shahla S. Sabet, Judge.  Reversed and remanded.

Susan K. Shaler, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Amanda E. Casillas, Deputy Attorneys General, for Plaintiff and Respondent.

This case arose from the murder of William Merrell, who died after he suffered five gunshots to his legs.  The prosecution charged Anthony Michael Wagner with

Merrell's murder based on the sole theory that he was the shooter. The prosecution did not argue Wagner was guilty as an aider and abettor, and the court did not instruct the jury on aiding and abetting.

A jury convicted Wagner of second degree murder (Pen. Code,[1] § 187, subd. (a)) and found to be true an allegation that he committed the crime for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members, within the meaning of section 186.22, subdivision (b)(1)(C) (hereafter section 186.22(b)(1)(C)).

However, the jury found to be *not true* allegations that, in committing the murder, Wagner (1) personally used a firearm (§ 12022.53, subd. (b)), (2) personally and intentionally discharged a firearm (§ 12022.53, subd. (c)), and (3) personally and intentionally discharged a firearm, causing Merrell's death (§ 12022.53, subd. (d)).

The court sentenced Wagner to an indeterminate state prison term of 15 years to life for his second degree murder conviction and imposed, but stayed, a 10-year prison term for the gang enhancement.

Wagner raises four contentions on appeal. First, he contends his murder conviction should be reversed because the court prejudicially erred in refusing to answer a jury question about whether "just being" at the scene of the murder constituted "committing an act that caused the death of another person" within the meaning of the murder instructions in CALCRIM No. 520. Second, he contends the jury's true finding

---

[1] All further statutory references are to the Penal Code.

2

on the gang enhancement allegation must be reversed because the evidence is insufficient as a matter of law to prove he committed the murder for the benefit of a criminal street gang. Third, he contends the order requiring him to pay $505 for the cost of the probation investigation and the probation report should be vacated because the statutory prerequisites for imposing those costs were not met and, as a result, there is no substantial evidence of his ability to pay the $505. Last, he contends the true finding on the gang enhancement allegation should be reversed because the court violated his Sixth Amendment right to confrontation by allowing the prosecution gang expert, Jeremy Dean, to testify about testimonial hearsay statements made by Jeremy "Shanx" Gonzales, who Dean testified was associated with the VLS gang.

We conclude the court prejudicially abused its discretion by misinstructing the jury and failing to answer the jury's question about whether "just being" at the scene of the murder constituted "committing an act that caused the death of another person" within the meaning of CALCRIM No. 520. Accordingly, we reverse the judgment and remand the matter for further proceedings.

## FACTUAL BACKGROUND

A. *The People's Case*

When the shooting occurred in 2011, MiVida Nunez and Wagner had been dating for around 10 years, since MiVida[2] was 14 years old. They had two children together.

---

2       As several members of the Nunez family testified, we refer to them by their first names.

3

Before MiVida began dating Wagner, she briefly dated the victim, Merrell. Once friends, Wagner and Merrell stopped getting along at some point.

Around 2006, MiVida's mother, Reina Nunez, began dating Merrell. Reina lived with her father, her children (MiVida, Jessica, and Anthony), and her two grandchildren in Rancho Cucamonga. Reina testified that Merrell also lived with her "[o]ff and on."

MiVida lived with Wagner in Montclair. Wagner was jealous and controlling with MiVida at times, and this caused problems in their relationship. They argued a lot and engaged in what MiVida testified were "push fights." When this happened, MiVida would return to live with her family.

According to Reina, MiVida sometimes had a black eye or bruises when she returned home, and she would tell Reina that Wagner gave her those injuries. About August of 2011, MiVida and her two children moved back in with Reina. MiVida had a black eye when she returned. MiVida was living there when Merrell was murdered.

*Night of the Shooting*

On October 13, 2011, Wagner spent the day at his house drinking alcohol with his longtime friend, Javier Ortiz. Michael Madden (also known as "Mountain Man"),[3] Ortiz's girlfriend Hazel Avila, and Keaton McGuire were also there. Wagner, Ortiz, and Avila left to buy gas and more beer. They returned and continued to visit. Around 9:00 p.m., Ortiz and Avila left because Ortiz had to work. About 10 minutes after they left,

---

[3]    Madden exercised his Fifth Amendment right not to testify. The jury only knew of him by his nickname "Mountain Man."

4

Avila realized she left her debit card at Wagner's house. She returned for the card. McGuire was inside playing video games; Wagner and Mountain Man were not there.

That same evening, between 7:30 and 8:30 p.m., Wagner called MiVida several times. Anthony, who overheard one of the calls, testified that Wagner sounded mad. Wagner told MiVida she better tell him if there were any men at the house, and MiVida told him there were none. Wagner said he would be over to check, and MiVida told him not to and then the phone call ended. After MiVida got off the phone with Wagner, Anthony heard her call Reina.

At around 6:30 p.m. on the day of the shooting, Reina and Merrell were at Ernesto Jauregui's house, smoking marijuana. Reina testified that while they were there, she received about six calls from MiVida. MiVida was increasingly upset with each call. MiVida told Reina that Wagner was mad at her (MiVida) and threatening her, and that she (Reina) and Merrell should stay away from the Nunezes' (Reina's) house because Wagner was going to go there and would start trouble if he saw Merrell or Merrell's car there.

Reina was concerned because Wagner had caused trouble at her house before. In late 2009 or early 2010, Wagner came to Reina's house with six or eight other men, and Merrell and MiVida were living with Reina at the time. Wagner rang the doorbell and pounded on the door. He shouted, "Come outside, bitch." Before he left, Wagner yelled, "Ghost Town." Wagner was a member of a gang called Upland Ghost Town (also known as Ghost Town) The windshield and two side windows of Merrell's car were broken, but Reina did not see who broke them.

5

A few years earlier in 2007, MiVida was shot in the arm in front of Reina's house. Reina was not at home at the time. MiVida initially said Wagner shot her. MiVida later denied this and said someone named Echo shot her.

After Reina received the calls from MiVida, she (Reina) and Merrell left Jauregui's house and went to Gabriel Gutierrez's house so that Merrell could get a gun. However, Merrell was unable to obtain a gun and they returned to Reina's house.

Merrell and Reina arrived there at around 9:00 or 9:30 p.m. Merrell parked his car across the street from the house and they ate tacos on the trunk of the car. Reina's 13-year-old son Anthony joined them there for dinner. MiVida, her children, and her sister Jessica were inside the house.

While Reina, Merrell, and Anthony were eating on the trunk of Merrell's car, a red Volkswagen Jetta with tinted windows drove past them slowly and then sped away. Reina saw the Jetta drive by about three times. Anthony testified he saw it drive by back and forth "[p]robably at least six times or seven, maybe eight" while they were eating.

Reina testified she was worried after the first time the Jetta drove by them, and she told Merrell and Anthony, "Let's go. Let's go in the gates. Let's go inside." They all went inside the house. Soon thereafter, however, they went back outside and sat on the trunk of Reina's father's car to smoke a "blunt." Reina testified that the red Jetta drove by again and Merrell told her to go back inside the house and ask MiVida if she knew that car. Merrell also told Reina, "Remember this: Red Jetta Volkswagen." Reina replied, "Volkswagen what?" Merrell kept yelling at her to remember and then told her, "I'm sorry, Reina, don't mess around. You've got to get this right. Go ask [MiVida]."

6

Anthony testified he saw another car, a silver one, drive by when he was eating on the trunk of Merrell's car about six minutes after he first saw the red car. He stated the silver car "would do the same thing, just the opposite way of, like, the red car would go." It would "slow down, and speed off." Anthony also testified the silver car, like the red car, "was just going back and forth." He could not see who was in the silver car because the windows were tinted.

Jessica left to go to her boyfriend's house. Reina went inside the house and asked MiVida if she knew anyone in the red Jetta Volkswagen. MiVida said, "No," but then said she was not sure.

Merrell stayed outside. Reina testified she was inside the house when she heard Merrell and Wagner arguing outside. Soon thereafter she heard gunshots.

Reina's son Anthony testified he heard two voices outside arguing. He identified one voice as Wagner's and one voice as Merrell's. Anthony heard Merrell say, "Let's finish this." Then he heard five gunshots.

Reina called 911 and MiVida ran outside and then ran back in, shouting there had been a shooting. Merrell ran into the house shouting he had been shot. He was bleeding profusely from his legs. (1RT 164.) Reina was crying and screaming and tried to stop Merrell's bleeding with towels. Merrell started panicking. Before the police arrived, Reina asked Merrell, "Who did this?" Merrell responded, "That fool, Magoo." Wagner's nicknames were "Magoo" and "Wild."

Deputy Daniel Maddox of the San Bernardino County Sheriff's Department testified that, when he arrived at the scene, Merrell was in pain on the floor inside the

7

house with Reina by his side attending his gunshot wounds. Deputy Maddox moved Reina out of the way and asked Merrell who shot him. Merrell, who was in pain on the floor with Reina by his side attending his gunshot wounds, responded by saying several times, "I can't." Deputy Maddox testified that Merrell's eyes were open, but he was not responding to Deputy Maddox's questions. Merrell never told Deputy Maddox who the shooter was.

Deputy Maddox testified the paramedics arrived a few minutes later while he was talking to Reina. The interview was not formal. When Deputy Maddox asked Reina who had shot Merrell, she mentioned Wagner. Reina told him about the red sedan that had driven past the house while she and Merrell were eating outside the house, and she reported that Merrell was suspicious of it. Deputy Maddox also testified that Reina told him that she heard the car come back later and pull up to the front of the house, and then she heard the gunshots. The prosecutor asked Deputy Maddox, "Did [Reina] say whether she looked out at that point and saw anything?" Deputy Maddox replied, "Yes. She looked up and saw through the bushes, the bottom of the rose bushes, two sets of legs." Reina later told a detective she recognized Wagner's legs.

The paramedics took Merrell to a hospital where he died from his gunshot wounds. Nine .45-caliber shell casings were found at the scene. The casings were mostly likely fired from a Glock semiautomatic handgun, and nine shots were fired from the same weapon.

*Wagner's Phone Calls After the Shooting*

The day after the shooting, Wagner called Avila and her boyfriend Ortiz, who shared a phone, and said he wanted to hang out with them "one last time." Sergeant Michael Smith, a detective with the San Bernardino County Sheriff's Department interviewed Ortiz about the conversation. Sergeant Smith testified that Ortiz told him Wagner said something along the lines of, "I don't know. I blasted that fool." Sergeant Smith asked Ortiz whether Wagner admitted to Ortiz that he killed Merrell, and Ortiz said yes.

*Wagner's Arrest*

Wagner was arrested in late November 2011 at Michael Coleman's house in Apple Valley. Wagner had been staying with Coleman for a week or two. Keaton McGuire had arranged for Wagner to stay there. A day after Wagner arrived, McGuire brought over a rifle case and put it behind the couch. When the police arrested Wagner, they searched the house and found a Stag Arms AR-15 semiautomatic rifle in the case behind the couch. Inside the case were three magazines, two of which were loaded with 30 rounds, and a plastic bag that contained a significant number of additional rounds. Police found a sales receipt for the rifle. It was registered to Keaton McGuire. Some versions of the AR-15 semiautomatic rifle are legal, but this particular rifle had unlawful modifications to it. Police found no paperwork connecting Wagner to the rifle.

9

*MiVida's Statements to Fellow Inmate Gina Garcia*

MiVida testified that she pleaded guilty in February 2012 to being an accessory after the fact for her role in helping Wagner hide from law enforcement. She served time in custody for that offense.

Gina Garcia testified that she spoke with MiVida while they both were in jail. MiVida told Garcia she was in custody for being an accessory to murder and that her boyfriend had killed her mother's boyfriend. Garcia acknowledged she was then in custody for felony commercial burglary. On cross-examination, she acknowledged she had suffered three prior theft convictions, in 2009, 2010, and 2012. Garcia further acknowledged she had lied to the police on multiple occasions by giving false names when they asked for her identity, and she had suffered a conviction in San Bernardino County for lying about her identity.

*Gang Evidence*

When Wagner was younger, he belonged to a tagging crew called 1K, which stood for "1 Nasty Krew" or "1 Nasty Enemy." Wagner later joined the Upland Ghost Town gang. He was "jumped" into that gang.

The prosecution's gang expert, Deputy Jeremy Dean, a detective with the San Bernardino Sheriff's Department, testified there were about 20 members or associates of Upland Ghost Town. The territory of that gang was the middle of Upland. It was aligned with two other gangs, Upland 9th Street and Upland Los Olivos. Its biggest rival was the Cucamonga Dog Patch gang.

10

Dean testified that the primary activities of Upland Ghost Town included assaults with deadly weapons, robberies, carjackings, and murder. In 2010 Upland Ghost Town gang member Mario Mayorga pleaded guilty to assault with a deadly weapon, after having been charged with attempted murder. In 2008 Gabriel Oliva Martinez, another gang member, was convicted of being a gang member in possession of a firearm.

According to Dean, Upland Ghost Town had a common sign or symbol. It used the initials "UGT" for "Upland Ghost Town" and "GT" in some of its graffiti for "Ghost Town," and it also used "G Street" and "Spook Town." The gang members associated with the Indianapolis Colts, the NFL football team whose team logo is a horseshoe, which looks like the letter "U."

Dean testified that Wagner did not have any tattoos with the initials "UGT" or "GT." When asked about Wagner's tattoos, Dean stated Wagner had an "I" on the back of his left arm, which stood for "Inland," and an "E" on the back of his right arm, which stood for "Empire." Together, the two tattoos ("IE") stood for Inland Empire. Dean had seen other gang members from the Inland Empire with "IE" tattoos.

Dean opined there were two facets to the motive in this case: one was gang related, and the other had to do with family issues. Merrell, the victim, was associated with the Vatos Locos Sur, or VLS, gang from Alta Loma. Merrell used the nickname "Spooky," and he had several gang-related tattoos on his head, face, chest, back, legs, an arm, and an ankle. The initials "VLS" were tattooed on the back of Merrell's head. Merrell's girlfriend Reina's home, where the shooting occurred, was in VLS territory.

11

According to MiVida, the VLS and Upland Ghost Town gangs did not get along. According to Dean, rivals of VLS included anyone who infringed on their criminal activity or disrespected them in any way. In the past, this included Cucamonga Kings, Cucamonga Dog Patch, and Ontario Black Angels.

Dean opined that Wagner's reputation increased within the Upland Ghost Town gang after Merrell was murdered. Dean based his opinion on the fact that people hid Wagner after the shooting, text messages were sent out to intimidate people who had cooperated with law enforcement, people put money on Wagner's "books" so he could purchase things, and witnesses visited him in jail.

Dean also opined that the reputation of Upland Ghost Town had increased following the murder. Dean based his opinion on his conversation with Jeremy "Shanx" Gonzales, who was associated with the VLS gang, and on the fact that Gonzales told him he was aware that Upland Ghost Town was responsible for Merrell's murder and that there would be future repercussions or retaliation as a result of the incident. Dean stated that Gonzales was later arrested for possessing an AR-15 assault rifle and a shotgun in VLS territory.

Dean further opined that Merrell's murder was committed for the benefit of Upland Ghost Town. Dean testified that the murder benefited Upland Ghost Town "by their reputation and status." Dean noted that "[t]he willingness of . . . people to cooperate with law enforcement diminishes after [they see] the type of violence that the gang is willing to commit." Specifically, he testified that he "saw the testimony from witnesses who were willing to cooperate in the very initial stages of the investigation and gave

12

statements, changed their stories as time has passed and ultimately for [the] preliminary hearing and now at jury trial." Dean further explained that this benefits Upland Ghost Town in the future because its members are "able to continue their activity, including acts of violence," and, "oftentimes, those crimes will go unreported."

B. *The Defense*

MiVida was the sole witness for the defense. She testified that Wagner had tattoos on his legs, spanning his shins and calves, that were readily visible from all angles. He had a clown tattoo on his left leg and a tattoo of MiVida's face on his right leg. Wagner had both of these tattoos on October 13, 2011, the day of the shooting.

DISCUSSION

I. *COURT'S RESPONSE TO JURY QUESTION*

Wagner first contends his murder conviction should be reversed because the court prejudicially erred in refusing to answer a jury question about whether "just being" at the scene of the murder constituted "committing an act that caused the death of another person" within the meaning of the murder instruction set forth in CALCRIM No. 520. We conclude the court prejudicially erred.

A. *Procedural Background*

During deliberations the jury sent a note to the court asking for clarification about whether "just <u>being</u>" at the scene of the murder constituted "'committing an act that caused the death of another person.'" Specifically, the jury asked:

> "<u>Clarify</u> Count 1 − murder − [does] just <u>being there</u> − (not the shooter) consitute [*sic*] 'committing an act that caused the death of another person.'"

13

The jury's question derived from CALCRIM No. 520, the standard instruction the court gave explaining the two elements of murder. That instruction stated in part:

> "The defendant is charged in Count 1 with murder. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant *committed an act that caused the death of another person*; [¶] AND [¶] 2. When the defendant acted, he had a state of mind called malice aforethought." (Italics added.)

The portion of the jury's note stating "'committing an act that caused the death of another person'" was taken from the foregoing quoted language of CALCRIM No. 520.

Outside the presence of the jury, the court and both counsel discussed the jury's question. The transcript of the discussion shows the court denied defense counsel's request that the court answer the question by telling the jury, "No," and that the court decided to respond by referring the jurors to the original murder instruction it gave, CALCRIM No. 520:

> "THE COURT: Okay. As to request No. 2, it says, 'Clarify. Count 1—murder—is just being there,' underscored; in parenthesis, 'not the shooter, constitute [*sic*] committing an act that causes the death of another person.' [¶] So what they're asking is if they conclude that he was just there, not the shooter, does that 'being there' alone constitute the act of causing death of another person? [¶] I'm not, frankly, sure what they're talking about. But—
>
> "[DEFENSE COUNSEL]: Well, it sounds to me that they're asking whether or not they can convict him if they say he was just there and somebody else shot the victim. Or I think what they're asking is do they need to find he was the shooter in order to convict him.
>
> "[PROSECUTOR]: I think we refer them back to the jury instruction which indicates exactly what they need to find for murder. [¶] . . .

14

"[DEFENSE COUNSEL]: [] I disagree. It sounds like they're on a path of like trying to see if they can convict him as an aider and an abettor. They weren't instructed on that. The People's argument was that he was the shooter. If they don't feel that he was the shooter, then he's not guilty.

"[PROSECUTOR]: Then that's what the jury instruction would say, and you're assuming that's what they're thinking.

"THE COURT: Okay. Let me say this. Obviously, their question has to do with aider and abettor. Obviously, the aider and abettor instructions were not given because the theory of the People was that he was the shooter even though other people may have been there. That was the entire theory of the case. [¶] Do you agree so far?

"[PROSECUTOR]: Yes.

"[DEFENSE COUNSEL]: I would agree.

"THE COURT: Okay. Both sides agree to that. [¶] So the issue is how to answer that? We know what they're asking. If we find that he's an aider and abettor, then can we convict him? And I want to know what [the prosecutor's] answer to that question is.

"[PROSECUTOR]: He would have to do something affirmative to aid and abet.

THE COURT: Exactly.

"[PROSECUTOR]: The jury instructions aren't included, which means we refer them back to the original.

"THE COURT: Exactly. Even though I did not instruct them, they're not asking for aiding and abetting. They're just saying 'being there.' So they're really reaching at this point. [¶] Even though, [defense counsel], I agree with you that if that's their conclusion, they should come back not guilty, that is within the jury instructions. So—

"[DEFENSE COUNSEL]: What is within the jury instruction?

15

"THE COURT:  The fact that the [prosecutor] proceeded with the theory that he was the shooter.  Not once [did] anybody argue[] or present[] evidence as to what would happen if he was just there.

"[DEFENSE COUNSEL]:  Correct.

"THE COURT:  So my response to this question should be[,] '[R]efer to your jury instructions.'

"[DEFENSE COUNSEL]:  I disagree.  I think . . . the answer should be if you don't think that he was the shooter then he's entitled to a verdict of not guilty.  The People's theory is he was the shooter.

"THE COURT:  Yes.

"[DEFENSE COUNSEL]:  There was no insinuation whatsoever during the entire course of testimony that he was an aider and abettor and somebody else was the shooter.

"THE COURT:  Correct.

"[DEFENSE COUNSEL]:  So what they're asking is if we think he's there but he's not the shooter, can we still convict him?  Well, the answer to that question is, no, they cannot.

"[PROSECUTOR]:  The answer to that question is not guilty.

"[DEFENSE COUNSEL]:  I agree.

"[PROSECUTOR]:  Then that's what they've got.

"[DEFENSE COUNSEL]:  But I think the Court should—they asked a very direct question, and I think the Court should answer directly as well.

"THE COURT:  'Is just being there constitute [*sic*] committing an act that causes the death of another person.'  And your answer is no.

"[DEFENSE COUNSEL]:  No—yes.

"[PROSECUTOR]:  And my answer is refer to the four elements of murder—or three.  And that clearly tells them without giving them

16

law that we didn't give them in the jury instructions for whatever reason.

"[DEFENSE COUNSEL]: Well, no. The reason it wasn't given in the jury instruction is because the People didn't present any evidence—

"[PROSECUTOR]: Right.

"[DEFENSE COUNSEL]: —to support that instruction.

"THE COURT: Correct. And so you refer them back to the jury instruction and the theory that I did go on which is murder.

"[DEFENSE COUNSEL]: I disagree, Judge. I think they asked a very direct question. It think the direct question deserves a direct response.

"[PROSECUTOR]: And I think it's providing law—

"THE COURT: Well, hold on. Hold on. Sorry for interrupting.

"[PROSECUTOR]: That's quite all right.

"THE COURT: [I]f I answer 'no' as [defense counsel wants], then I have to say the full and correct answer: No, unless he was an aider and abettor. And then I have to bring them back and instruct on aiding and abetting. Because the jury has a prerogative of convicting him under another theory, even though the [prosecutor's] theory is that he was a shooter.

"[DEFENSE COUNSEL]: I disagree, your Honor. [H]ow could the Court instruct on a theory that's not supported by the evidence?

"THE COURT: It is—

"[DEFENSE COUNSEL]: (Unintelligible.)

"THE COURT: Hold on. It is supported by the evidence. [¶] If they convict him under an aider and abettor theory, the Court of Appeals [*sic*] will affirm that, simply because there's more than sufficient evidence on both theories. The [prosecutor] chose the theory [that] he was the shooter. In fact, she limited herself to it.

17

But there was insinuation, and I instructed there were other people involved.[4]

"[DEFENSE COUNSEL]: If the Court is going to instruct on aider and abettor, then I'm going to ask the Court to allow me to argue that to the jury in a second closing then.

"THE COURT: I know. I know that. And that's why I'm going to—in fact, since the [prosecutor] limited herself to that theory, you're better off if I only answer 'refer to your jury instructions.' [¶] If they send another question . . . saying, you know, 'We need the definition of aider and abettor. What does it involve if he's not the shooter?' Then I can really consider, and I will consider opening it up to giving instructions under aider and abettor. Because the evidence supports that, supports that theory. [¶] They're not pulling it out of the empty sky. There is as much evidence to convict him, if they wish to convict him, under the shooter theory or under aider and abettor.

"[DEFENSE COUNSEL]: Well, your Honor, I'll object. [¶] The Court—the Court is fine. The Court can answer however it wishes. I made my record. I think that's fine.

"THE COURT: Yes. I appreciate that. And I am going to seriously consider what to do if another question comes up under a theory of aider and abettor. In fact, I'm going to research this and see what would happen if that becomes a reality. [¶] But in the meantime, all I'm going to do, which is the most neutral, noncommittal way of answering the question, is 'refer to your jury instructions.' That's over your objection, of course.

"[DEFENSE COUNSEL]: That's fine."

---

4      The court instructed the jury under CALCRIM No. 373 as follows: "The evidence shows that other persons may have been involved in the commission of the crime charged against the defendant. There may be many reasons why someone who appears to have been involved might not be a codefendant in this particular trial. You must not speculate about whether those other persons have been or will be prosecuted. Your duty is to decide whether the defendant on trial here committed the crime charged."

18

`   B.  *Applicable Legal Principles*

   1.  *Duty to instruct on relevant principles of law*

"The trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request."  (*People v. Blair* (2005) 36 Cal.4th 686, 744 (*Blair*).)  "The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and . . . necessary for the jury's understanding."  (*People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*).)

   2.  *Section 1138*

A deliberating jury's request for information about a point of law that has arisen in the case triggers section 1138, which provides:  "After the jury have retired for deliberation, . . . if they desire to be informed *on any point of law arising in the case*, they must require the officer to conduct them into court.  Upon being brought into court, *the information required must be given . . . .*"  (Italics added.)

Thus, section 1138 imposes on the trial court a mandatory duty "to clear up any instructional confusion expressed by the jury."  (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1212 (*Gonzalez*), superseded by statute on another point as indicated in *In re Steele* (2004) 32 Cal.4th 682, 690.)  "This does not mean the court must always elaborate on the standard instructions.  Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information."  (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.)

19

3. *Standard of review*

We generally review de novo a claim of instructional error. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) However, "[a]n appellate court applies the abuse of discretion standard of review to any decision by a trial court to instruct, or not to instruct, in its exercise of its supervision over a deliberating jury." (*People v. Waidla* (2000) 22 Cal.4th 690, 745-746.)

C. *Analysis*

1. *The court's instructional errors*

It is undisputed that Merrell was murdered by someone who shot him outside Reina's house. At trial the prosecution's allegation that Wagner was guilty of the murder was based on the sole theory there was one shooter and Wagner was the shooter. The prosecution did not allege Wagner was guilty of the murder as an aider and abettor, and the court gave no jury instructions on aiding and abetting.

The court's murder instruction under CALCRIM No. 520 told the jury that to prove Wagner was guilty of the murder, the People were required to prove that (1) Wagner "committed an act that caused" Merrell's death, and (2) Wagner acted with malice aforethought. The jury asked no question about malice aforethought, which was defined in CALCRIM No. 520.

However, in their note asking the court whether "just being there" at the scene of the murder constituted "'committing an act that caused the death of another person," the jury expressed confusion about this first element of murder set forth in CALCRIM No. 520. By asking this question the jury requested information about "[a] point of law

20

arising in the case" (§ 1138). Thus, the jury's note triggered the provisions of section 1138 (discussed, *ante*) and the court had a mandatory duty to "clear up [the] instructional confusion expressed by the jury." (*Gonzalez*, *supra*, 51 Cal.3d at p. 1212.)

The court abused its discretion by failing to clear up the instructional confusion expressed by the jury. During the discussion about how the court should respond to the jury's question, defense counsel expressed concern about it by stating the jurors were "on a path of . . . trying to see if they can convict him as an *aider and an abettor*. They weren't instructed on that. The People's argument was that he was the shooter." (Italics added.) Urging the court to respond to the note "directly" by telling the jury that the answer to their question was "No," Wagner's counsel argued, "[W]hat they're asking is if we think he's there but he's not the shooter, can we still convict him? Well, the answer to that question is, no, they cannot." Counsel also argued "the answer should be if you don't think that he was the shooter then he's entitled to a verdict of not guilty. The People's theory is he was the shooter." The court agreed, stating, "Yes."

However, after further discussion, the court rejected defense counsel's requests and answered the jury's question with a written response that simply referred the jury back to the same jury instructions (CALCRIM No. 520) that the jury found confusing.[5] Thus, we conclude the court abused its discretion by failing to "clear up [the] instructional confusion expressed by the jury" (*Gonzalez*, *supra*, 51 Cal.3d at p. 1212).

---

[5] Specifically, the court's written response stated, "Refer to your jury instructions."

21

We also conclude the court erred by failing to instruct the jury sua sponte on aiding and abetting. As already discussed, a trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request. (*Blair*, *supra*, 36 Cal.4th at p. 744.)

Here, the court acknowledged during the discussion about the jury's question that the issue of whether Wagner aided and abetted Merrell's murder was raised by the evidence. The court stated, "Obviously, their question has to do with aider and abettor," and then added, "We know what they're asking. If we find that he's an aider and abettor, then can we convict him?" The court stated that if it were to answer "no" to the jury's question about whether "just <u>being</u>" at the scene of the shooting constituted "'committing an act that caused the death of another person,'" the court "[would] have to say the full and correct answer: No, unless he was an aider and abettor. And then I [would] have to bring them back and instruct on aiding and abetting." Defense counsel responded by arguing the evidence did not support the giving of instructions on aiding and abetting, and the court replied, "It is supported by the evidence." The court stated it had "instructed there were other people involved." The record shows the court instructed the jury under CALCRIM No. 373 (see fn. 4, *ante*) which informed the jury, "The evidence shows that other persons may have been involved in the commission of the crime charged against the defendant." Because the evidence supported the giving of jury instruction on the general principles of aiding and abetting, which were "'closely and openly connected with the facts'" in this case (*Breverman*, *supra*, 19 Cal.4th at p. 154), the court erred by failing to instruct the jury on those principles. (See *Blair*, *supra*, 36 Cal.4th at p. 744.)

22

The court also had a duty to instruct the jury sua sponte with the bracketed paragraph in CALCRIM No. 401 ("Aiding and Abetting: Intended Crimes") which addresses how the jury should consider a defendant's *mere presence at the scene* of the crime or his knowledge that a crime was being committed. That portion of CALCRIM No. 401 states:

> "[If you conclude that defendant was *present at the scene* of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor. [¶] However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him or her an aider and abettor.]" (Italics added.)

The bench notes to CALCRIM No. 401, citing *People v. Boyd* (1990) 222 Cal.App.3d 541 (*Boyd*) and *In re Michael T.* (1978) 84 Cal.App.3d 907, states that "[i]f there is evidence the defendant was merely present at the scene or only had knowledge that a crime was being committed, the court has a sua sponte duty to give the bracketed paragraph." (Boldface deleted.)

Here, although no witness testified he or she saw the shooting, the testimony of Reina and her son Anthony placed Wagner at the scene of the murder when the shooting occurred. The jury's note indicates they were wrestling with the question of whether Wagner's mere presence—his "just <u>being there</u>"—could be "an act that caused" Merrell's death within the meaning of CALCRIM No. 520. We conclude the court erred by failing to instruct the jury sua sponte with the "present at the scene" instruction contained in the first bracketed paragraph of CALCRIM No. 401. (See *Boyd*, *supra*, 222 Cal.App.3d at p. 557, fns. 13, 14.)

## 2. *Prejudice*

We also conclude the court's instructional errors were prejudicial and require reversal of Wagner's conviction. The legal principles that guide our analysis are well established.

"The prosecution bears the burden of proving all elements of the offense charged, [citations], and must persuade the factfinder 'beyond a reasonable doubt' of the facts necessary to establish each of those elements." (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 277-278.) "It is axiomatic that a conviction upon a charge not made or upon a charge not tried constitutes a denial of due process." (*Jackson v. Virginia* (1979) 443 U.S. 307, 314.)

"Under established law, instructional error relieving the prosecution of the burden of proving beyond a reasonable doubt each element of the charged offense violates the defendant's rights under both the United States and California Constitutions." (*People v. Flood* (1998) 18 Cal.4th 470, 479-480 (*Flood*).) "[T]he failure to correctly instruct as to an element of an offense can violate the United States Constitution." (*People v. Avila* (1995) 35 Cal.App.4th 642, 652 (*Avila*).)

"[T]he United States Supreme Court . . . has consistently applied [the standard of prejudice under *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*)] to instructional error cases involving either *misinstruction of a single element of a charged crime* or a constitutional defense." (*Avila*, *supra*, 35 Cal.App.4th at p. 662, italics added.) "[A]n instructional error that improperly describes . . . an offense . . . is not a structural defect in the trial mechanism that defies harmless error review and automatically requires

24

reversal under the federal Constitution [but] . . . such an error . . . falls within the broad category of trial error subject to *Chapman* review." (*Flood*, *supra*, 18 Cal.4th at pp. 502-503.)

Under the *Chapman* standard, a federal constitutional error requires reversal unless the People show the error was "harmless beyond a reasonable doubt." (*Chapman*, *supra*, 386 U.S. at p. 24.) Alternatively stated, a conviction need not be reversed under the *Chapman* standard if the People show "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Ibid*.)

We conclude the *Chapman* standard of prejudice applies here because, as already discussed, the court misinstructed the jury by failing to clear up the instructional confusion expressed by the jury regarding the first element of murder and by failing to instruct the jury on aiding and abetting. (*Avila*, *supra*, 35 Cal.App.4th at p. 662.)

Applying the *Chapman* standard, we also conclude the Attorney General has failed to show the court's instructional errors were harmless beyond a reasonable doubt. This was a close case. Although the prosecution's sole theory of criminal liability was that Wagner murdered Merrell by shooting him, the jury convicted Wagner of the murder but inconsistently found to be *not true* all three of the gun use allegations. The jury thus found the prosecution had failed to meet its burden of proving beyond a reasonable doubt that Wagner was the shooter.

Furthermore, as discussed more fully in the factual background, *ante*, the testimony of two of the prosecution's witnesses, Reina and Anthony, showed that two cars with tinted windows—a red Volkswagen Jetta and a silver car—and an unknown

25

number of occupants repeatedly drove slowly by the murder scene and then sped away shortly before Merrell was shot. The prosecution's gang expert opined that Merrell's murder was gang-related. The court instructed the jury under CALCRIM No. 373 (see fn. 4, *ante*) that "[t]he evidence shows that other persons may have been involved in the commission of the crime charged against the defendant."

"Juror questions and requests to have testimony reread are indications the deliberations were close." (*People v. Pearch* (1991) 229 Cal.App.3d 1282, 1295.)

Here, the jury deliberated over a period of five days. On the fourth day of deliberations, the jury sent their note to the court asking for clarification about whether "just being" at the scene of the murder constituted "'committing an act that caused the death of another person.'" The jury also requested read-backs of the testimony of several prosecution witnesses.[6]

For all of the foregoing reasons, we conclude Wagner's conviction must be reversed and the matter remanded for further proceedings.[7]

---

[6] The jury requested read-backs of testimony given by Steven Pennington, Reina, Reina's son Anthony, Garcia, Ortiz, and Sergeant Smith.

[7] In light of our conclusion, we need not, and do not, address Wagner's remaining claims.

DISPOSITION

The judgment is reversed and the matter is remanded for further proceedings.


NARES, J.

WE CONCUR:


McCONNELL, P. J.


HUFFMAN, J.